149 U.S. 662 (1893)
CURTNER
v.
UNITED STATES.
No. 253.
Supreme Court of United States.
Argued April 24, 25, 1893.
Decided May 15, 1893.
APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.
*668 Mr. E.R. Taylor and Mr. Michael Mullany for appellants. Mr. Henry F. Crane was on Mr. Taylor's brief.
Mr. A.B. Browne for appellees. Mr. F.H. Waterman, Mr. A.T. Britton and Mr. Solicitor General were on his brief.
MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.
The lands in question were odd sections lying within the twenty-mile limit of the grant of lands made to the Central Pacific Railroad Company to aid in the construction of its road, and situated partly in township three south, range three *669 east, Mount Diablo base and meridian, and partly in township two south, range one east.
It is stated in the opinion of the Circuit Court, rendered on the final hearing, and reported, 38 Fed. Rep. 1, that "between May 15, 1863, and May 16, 1864, after actual survey in the field, but before the survey had been officially adopted or recognized by the Secretary of the Interior, and before it had been approved by the surveyor general and filed in the district land office, the State of California, by its locating agent, made selections and locations of all the lands now in controversy in township three, range three, in part satisfaction of the grant to the State of lands in lieu of sections 16 and 36, under the act of March 3, 1853, 10 Stat. 244, 246, c. 145. Between February 17, 1864, and February 9, 1866, the State had issued its certificates of purchase to the several purchasers thereof, the first payments of the purchase money having been made. The selections, apparently at their respective dates, were by the register of the land office entered in his office. A portion of these lands was certified over to the State by the Land Department at Washington, approved by the Secretary of the Interior on November 15, 1871, and the remainder on March 24, 1873, and they were afterwards patented to the purchasers by the State. The lands in controversy, situate in said township two, range one, were selected in advance of any survey in the field by the United States surveyor general, upon surveys made by the county surveyors of the State, between July 28, 1862, and July 20, 1863. Certificates of sale were issued to purchasers by the State for a part between March 2, 1863, and January 25, 1864, and for the remainder between February 20 and March 14, 1865. These selections were entered by the register of the land office on June 12, 1865. A part was certified over to the State by the Secretary of the Interior on September 8, 1870, and the rest on March 11, 1871. These lands were also afterwards patented to the purchasers by the State." In the view which we take of the case, this summary of the evidence in the particulars mentioned may for convenience be accepted without restatement.
The map of the general route of the railroad company was *670 filed in the General Land Office, December 8, 1864, and the order of withdrawal issued January 30, 1865. The road was completed December 29, 1869, and the map of definite location filed February 1, 1870. The selections of the railroad company embracing these lands were made May 12, 1874. The bill alleges, and the record shows, that patents for all but three hundred and twenty acres of the lands were issued to persons mentioned in the bill, from November 9, 1870, up to and including April 5, 1873, and that the three hundred and twenty acres were patented by the State to one of such persons March 4, 1878. The purchasers from the State and their grantees entered into actual occupation of the lands in controversy under their certificates of purchase, and from that time on had continued in the possession of the same. This suit was commenced July 23, 1883, over twelve years and eight months after the first patent issued, and over five years and four months after the issue of the last-named patent.
The Circuit Court held that lands are not surveyed lands by the United States until a certified copy of the official plat of survey has been filed in the local land office; that this had not been done in respect of these lands, or, if done, that the filing was too late; that they were therefore unsurveyed, and that the selections, being made on unsurveyed lands, were "utterly void." These premises were denied by appellants, both as to the law and the fact.
The Circuit Court also held that the state selections were void for the reason that the act of 1853, under which they were made, excepted from selection by the State, in lieu of school sections lost, "lands reserved by competent authority," and "lands claimed under any foreign grant or title," and "mineral lands;" and that these lands, were excepted because at the time of their selection, location and sale by the State they were claimed under a Mexican grant known as "Las Pocitas." Appellants contended that this conclusion was based on a mistaken construction of the act of 1853, and an erroneous application of the act, if properly so construed, under the facts in the case.
*671 Among the points raised upon the demurrer and necessarily presented upon the final hearing, were these: first, whether the United States had such an interest in the subject matter of the controversy as warranted their filing the bill; second, whether the claim set up was not barred by laches and limitations.
The bill averred that the United States had granted the land to the railroad company; that the railroad company was entitled to a patent; that the lands had been wrongfully listed to the State, and for that reason the United States refused to grant a patent for the same; and therefore the bill was filed to enable the government to issue the patent. But it was also alleged that the Western Pacific Railroad Company and its successor, the Central Pacific Railroad Company, did within three years of the completion of the road, sell and dispose of the land hereinbefore described to persons other than defendants. The road was completed December 29, 1869, so that the sale of the land by the railroad company to others than the defendants must have been before January, 1873, or nine and one-half years before the original bill was filed.
The rule in relation to the institution of suit by the Attorney General of the United States to vacate a patent is thus stated by Mr. Justice Miller in United States v. San Jacinto Tin Company, 125 U.S. 273, 285:
"But we are of opinion that since the right of the government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit, or any of those other practices which are admitted to justify a court in granting relief, the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter. If it be a question of property, a case must be made in which the court can afford a remedy in regard to that property; if it be a question of fraud which would render the instrument void, the fraud must operate to the prejudice of the United States; and if it is *672 apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited to sustain an action for his use; in short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances.
"In all the decisions to which we have just referred it is either expressed or implied that this interest or duty of the United States must exist as the foundation of the right of action. Of course this interest must be made to appear in the progress of the proceedings, either by pleading or evidence, and if there is a want of it, and the fact is manifest that the suit has actually been brought for the benefit of some third person, and that no obligation to the general public exists which requires the United States to bring it, then the suit must fail. In the case before us the bill itself leaves a fair implication that if this patent is set aside the title to the property will revert to the United States, together with the beneficial interest in it."
And in United States v. Beebe, 127 U.S. 338, 342, it was said by Mr. Justice Lamar, delivering the opinion of the court: "If a patent is wrongfully issued to one individual which should have been issued to another, or if two patents for the same land have been issued to two different individuals, it may properly be left to the individuals to settle, by personal litigation, the question of right in which they alone are interested. But if it should come to the knowledge of the government that a patent has been fraudently obtained, and that such fraudulent patent, if allowed to stand, would work prejudice to the interests or rights of the United States, or would prevent the government from fulfilling an obligation incurred by it, either to the public or to an individual, which personal litigation could not remedy, there would be an occasion which would make it the duty of the government to institute judicial proceedings to vacate such patent."
In the case before us, the State of California and its grantees *673 claimed title under the United States, as did the railroad company and its grantees. Either the grantees of the State or the grantees of the railroad had, when the bill was filed, the title to the land. No fraud or imposition or wrong as against the United States was charged, and no case made upon which the United States sought relief for themselves. Nor was the case one of mistake, in the sense that the action of the United States and the State would not have been what it was but for ignorance of particular facts or of the law. If the State acquired the legal title by the listings, that legal title passed to its grantees, and if the railroad company and its grantees acquired an equitable title, no reason is perceived why the real parties in interest could not litigate their claims as between each other. And this was equally true if the State's selections and the listings were wholly void. No wrong was chargeable to the State, and if the State and railroad company each claimed the land in good faith upon mere questions of law and fact, without any element of wrong or fraud, it does not appear to us that the bill should be regarded as accomplishing anything more than raising a controversy between the parties actually in interest.
Under the railroad grant acts themselves, nothing contained therein was to impair or defeat any valid claim existing at the time the line of the road was definitely fixed; and upon the face of this record there can be no question that the claim of the State of California, based upon its making selections of the lands and presenting the same for approval, was a claim in good faith, and the obligation of the United States to the State was as much to be considered as the obligation to the railroad company, and its liability to make good the loss was to that one of the parties upon whom the loss might finally fall.
We are of opinion that upon the case made, the same principles must be applied as if the litigation were between private parties.
In this regard, the case of United States v. Beebe, 127 U.S. 338, is exactly in point and of controlling weight. There a bona fide claimant had made a location under a New *674 Madrid certificate, perfected his claim, and received a certificate upon which he had become entitled to a patent for the land. Afterwards, and while the matter was pending, Beebe and others, as was alleged, by some imposition or fraud procured a patent to be issued to them for the same land. Suit was permitted to be brought in the name of the United States to cancel the Beebe patent, and the defences relied on in the court below were (1) the want of authority in the Attorney General to file a bill for an annulment of a patent in a case like that; (2) that the claim was barred by the statute of limitations; (3) that the claim sued on was stale; (4) that the complainant had no equity to maintain the suit. It was held by this court that the United States could properly proceed by bill in equity to have a judicial decree of annulment and an order of cancellation of a patent issued by mistake, or procured by fraud, where the government had a direct interest or was under an obligation respecting the relief sought; but that, in the language of Mr. Justice Lamar, "when the government is a mere formal complainant in a suit, not for the purpose of asserting any public right or protecting any public interest, title, or property, but merely to form a conduit through which one private person can conduct litigation against another private person, a court of equity will not be restrained from administering the equities existing between the real parties by any exemption of the government designed for the protection of the rights of the United States alone. The mere use of its name in a suit for the benefit of a private suitor cannot extend its immunity as a sovereign government to said private suitor, whereby he can avoid and escape the scrutiny of a court of equity into the matters pleaded against him by the other party; nor stop the court from examining into and deciding the case according to the principles governing courts of equity in like cases between private litigants. These principles, so far as they relate to general statutes of limitation, the laches of a party, and the lapse of time, have been rendered familiar to the legal mind by the oft-repeated enunciation and enforcement of them in the decisions of this court. According to these decisions, courts of equity in general *675 recognize and give effect to the statute of limitations as a defence to an equitable right, when at law it would have been properly pleaded as a bar to a legal right."
The decision of the Circuit Court in that case dismissing the bill on the ground of laches was sustained, because, although Beebe had procured his patent by fraud and imposition upon the government or its officers, and the superior right to the land was originally in others, yet it was apparent that the suit was prosecuted in the name of the United States only on behalf of private persons, and therefore should be barred if they were.
Tested by this rule, it is clear that the claim of the railroad company and its grantees cannot be sustained.
The grant was in præsenti, and attached upon the filing of a map of definite location. When the identification of a granted section became so far complete as to authorize the grantee to take possession, the legal title of the granted land passed, and an action for possession could be maintained by the company or its grantees before the issue of a patent. The patent would have been evidence that the land named was granted, that the grantee had complied with the conditions of the grant, and that the grant was to that extent relieved from the possibility of forfeiture for breach of its conditions, but was not essential to transfer the legal right. Deseret Salt Company v. Tarpey, 142 U.S. 241; Sioux City Company v. Griffey, 143 U.S. 32.
The company had, on February 1, 1870, whatever title it could obtain, and whatever rights belonged to it, and its cause of action then accrued. The land had already been certified to the State by the Commissioner of the General Land Office and the Secretary of the Interior, and their action in that regard was in law the same as if patents had been issued to the State. Frasher v. O'Connor, 115 U.S. 102.
If that action was wholly void, then it was open to collateral attack, and the railroad company and its grantees could have brought suit to test the legal title at once. Doolan v. Carr, 125 U.S. 618.
If that action was not void, but the Interior Department had taken mistaken views of the law, or drawn erroneous conclusions *676 from the evidence, and the railroad company and its grantees possessed such equities as would control the legal title vested in the State and its grantees, then resort could have been had to a court of equity for relief. Smelting Co. v. Kemp, 104 U.S. 636.
In either aspect, the rights of the parties could have been determined by proceedings on behalf of the company or its grantees against the patentees of the State or their grantees; but instead of instituting such proceedings, the railroad company besieged the principal officers of the Land Department to ignore the action of their predecessors in office, and to exercise a power that had become functus officio. Noble v. Union River Logging Railroad, 147 U.S. 175. If patents had been issued to the railroad company, then the case would have been presented of two patents for the same land issued to two different parties, and, as pointed out in United States v. Beebe, the matter might properly be left to those parties to settle by personal litigation.
This bill was not filed until more than thirteen years after the cause of action had accrued, and twelve years after the first patent, and over five years after the last patent, was issued, by the State, while the selections and purchases thereunder were made long before.
Under the laws of California, an action may be brought by any person against another, who claims an estate or interest in real property adverse to him, for the purpose of determining such adverse claim; but no action can be brought for the recovery of real property or for possession thereof, or arising out of the title thereto, unless such action is commenced within five years after the cause of action shall have accrued; and an action for relief not otherwise provided for must be commenced within four years. (Code Civ. Proc. Cal. §§ 318, 319, 343, 738.)
Whether the statute be applied directly or by analogy, or the rule in equity founded upon lapse of time and staleness of claim, the delay and laches here are fatal to the maintenance of the suit.
The ineffectual pressure of the company on the Land Department *677 furnished no excuse as between the real parties to this litigation, and the United States occupied no such relation to the case as to be entitled to the exemption from limitation and laches accorded to governments proceeding in their own right.
If through erroneous action of its officers, the bounty of the government in the particular instance has not reached those for whom it was intended, but has reached beneficiaries who were not intended to have these particular lands, the government may be relied on to effectuate its own designs, and to make good any moral obligation that rests upon it; but it had not such pecuniary or other interest in this litigation as entitled it to ask the suspension of the beneficent rules applied by the courts in the administration of justice between individuals.
The decree is reversed and the cause remanded with a direction to dismiss the bill.
MR. JUSTICE FIELD dissenting:
I am not able to agree with the majority of the court in their decision of this case. The lands in controversy fall within the limits of the grant to the Central Pacific Railroad Company; but by mistake and inadvertence of the Land Department they were listed to the State of California. Discovering its mistake, the department refused to issue to the company a patent for the lands to which it was entitled, until the erroneous listing to the State was set aside and annulled. The present bill was filed by the Attorney General for that purpose  and because of this proceeding and the delay of the company in waiting on its issue  instead of taking steps to enforce its rights at law for the land, this court now holds that it has lost the right to them; and that as the United States have no interest in the property, except to clear it of the cloud of the listings wrongly made, they cannot maintain the suit. The result, which produces simple injustice to the railroad company without wrong on its part, ought not in my judgment to be upheld.
*678 In United States v. Hughes, 11 How. 568, a patent had been issued by mistake to Hughes in disregard of the prior rights of one Goodbee and of parties deriving title under him. The United States filed an information in the nature of a bill in equity against Hughes for the repeal and surrender of his patent, on the ground that its existence impaired the ability of the government to fulfil its engagements to Goodbee. The case was before this court originally on demurrer, and it was held that the court had jurisdiction to annul the patent thus improvidently issued. When here a second time (4 Wall. 232) the court, reaffirming its first decision, said: "When this case was here on demurrer the patent was considered by the court to be a valid instrument, conveying the fee of the United States, and, until annulled, as rendering them incapable of complying with their engagement to Goodbee or his alienees. Whether regarded in that aspect, or as a void instrument, issued without authority, it prima facie passed the title, and, therefore, it was the plain duty of the United States to seek to vacate and annul the instrument, to the end that their previous engagement might be fulfilled by the transfer of a clear title, the only one intended for the purchaser by the act of Congress. The power of a court of equity, by its decree to vacate and annul the patent, under the circumstances of this case, is undoubted. Relief, when deeds or other instruments are executed by mistake or inadvertence or agents, as well as upon false suggestions, is a common head of equity jurisprudence."
Upon this doctrine the court below proceeded in this case, in order that the government might discharge its obligation to the railroad company. It is a case where the government admits the error of its officers of the Land Department, acknowledges its obligation to correct it, and seeks to remove from its records the inadvertent and erroneous certification to the State of the lands, so that it may be able to issue a clear title to the railroad company, the right of that company having been finally determined, and thus carry out the pledge of its grant.
There was at no time an admission by the railroad company *679 of the correctness of the original action of the Land Department, or any acquiescence therein, but, insisting always upon the error of its proceedings, the company urged upon the department to correct them and issue to it the patent which the law authorized.
The case is not, in my judgment, within the doctrine of United States v. Beebe, 127 U.S. 338, which would exclude the interference of the United States, but is within the doctrine which there recognizes and upholds it. In that case the original claimant had rested on the action of the Land Department, and sought the assistance of the United States only after the lapse of nearly half a century, and it was held that the interference of the government, after such a lapse of time, was simply a proceeding to avoid the laches of the claimant and to give to him the benefit of its exemption from them. But it declared that a suit of the United States would lie to set aside a patent where the government was under an obligation respecting the relief invoked. In this case the railroad company has not remained inactive, but upon a decision in its favor by the department, asked for its promised patent, which was only withheld because of the previous inadvertent and mistaken action of the government's officers in issuing a certificate to the State. In such circumstances the government, it seems to me, ought not to be debarred the right to correct the mistake of its officers, by which alone the intention of the law was defeated. I think the decree below should be affirmed.