### SOUTHERN PAC. R. CO. v. GROECK et al.

(Circuit Court, S. D. California. May 13, 1895.)

#### No. 347.

1. DEMURRER—FACTS JUDICIALLY NOTICED.
   The rule that, for the purpose of disposing of a demurrer, such facts as are well pleaded are taken to be true, does not apply where, by a public record, of which the court takes judicial notice, the facts are shown to be otherwise.

2. PUBLIC LANDS—GRANT TO RAILROAD—WITHDRAWAL FROM ENTRY.
   By an act passed July 27, 1866, congress granted to the S. P. Co., in aid of the construction of its railroad, the alternate odd-numbered sections of public land, to the amount of 10 per mile, on each side of the road, not reserved, sold, or otherwise appropriated, and in compensation for any land reserved, sold, or otherwise appropriated, within the granted limits, other lands to be selected in the alternate odd-numbered sections, not more than 10 miles beyond the granted limits. The act provided that "the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the * * * road after the general route shall be fixed * * * and the odd sections * * * shall not be liable to sale or entry or pre-emption before or after they are surveyed * * *." *Held*, that the law making the grant itself operated to withdraw from sale, pre-emption, homestead entry, or other disposition, the odd-numbered sections of land within both the granted and the indemnity limits. Buttz v. Railroad Co., 7 Sup. Ct. 100, 119 U. S. 72, and St. Paul & P. R. Co. v. Northern Pac. R. Co., 11 Sup. Ct. 389, 139 U. S. 18, followed.

3. SAME—EQUITY—LACHES.
   The general route of the road was fixed, and a map thereof filed, in 1867. The land within the indemnity limits was insufficient to make up the losses within the granted limits, and this fact was known as early as 1883. In 1885 one G. settled upon a part of the land within the indemnity limits, and filed a declaratory statement thereon. The S. P. Co. contested G.'s right to the land, in the land office and by appeal, but the land was patented to G. in 1890. In 1891 the S. P. Co. selected the same land, and offered all the fees for securing a patent, but the officers of the land office

refused to approve the selection. In 1892 the S. P. Co. brought suit in equity to establish its claim to the land, this being more than the period of the local statute of limitations since G.'s entry on the land. *Held,* that the S. P. Co. was guilty of laches in enforcing its claim, which deprived it of the right to relief in equity.

This was a suit by the Southern Pacific Railroad Company against Otto Groeck and others to establish the complainant's ownership of certain land, and compel a conveyance thereof. Defendants demurred to the bill.

J. D. Redding, for complainant.

W. B. Wallace, for defendants.

ROSS, Circuit Judge. The land in controversy having been patented to the defendant Groeck under the pre-emption laws of the United States, the complainant, claiming to be entitled to it by virtue of a congressional grant, seeks by this suit to obtain a decree that the title conveyed by the patent is held in trust for it, to compel the conveyance thereof to the complainant, and to enjoin the defendants from asserting any title thereunder. The grant under which the complainant claims the land is that of July 27, 1866 (14 Stat. 292), by which, among other things, the Southern Pacific Railroad Company was authorized to connect with the Atlantic & Pacific Railroad at such point near the boundary line of the state of California as it should deem most suitable for a railroad line to San Francisco, and, subject to certain conditions, exceptions, and limitations, was granted every alternate section of public land, not mineral, designated by odd numbers, to the amount of 10 alternate sections per mile on each side of said road, to which the United States should have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time such road should be designated by a plat thereof filed in the office of the commissioner of the general land office; and where, prior to said time, any of said sections or parts of sections should be granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, the act provided that other lands should "be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections designated by odd numbers, not more than ten miles beyond the limits of said alternate sections, and not including reserved numbers." The exceptions contained in the act are not applicable to this case, and need not, therefore, be referred to. The bill alleges, among other things, that on the 24th of November, 1866, the complainant, by its board of directors, accepted the grant upon the terms and conditions contained in it, which acceptance was filed with the secretary of the interior December 27, 1866, and that, on the 3d day of January, 1867, complainant filed with the secretary a map of the route of its road, as located and surveyed, which map was accepted by the secretary, and on the same day transmitted by him to the commissioner of the general land office, to be filed in that office, which was done on that day; that on the 22d of March, 1867, the commissioner transmitted a copy of the map to the register and receiver of the local land office at Vi-

salia, Cal., in which district the land in controversy is situated, and that the register of the local land office acknowledged its receipt by letter of date March 30, 1867; that on the 19th day of March, 1867, the secretary of the interior addressed to the commissioner of the general land office this letter:

"Department of the Interior.

"Washington, D. C., March 19, 1867.

"Sir: Under date of January 3, 1867, a map showing the designated route of the Southern Pacific Railroad in California, filed under the act of congress approved July 27, 1866, was sent to you for appropriate action. If a withdrawal of lands has not been ordered on account of said road, you will cause the necessary instructions to be issued to the local land offices to withhold the odd sections within the granted limits of twenty miles on each side of said road, as shown on the map before mentioned, and also withdraw the odd sections outside of the twenty miles and within thirty miles on each side, from which the indemnity for lands disposed of within the granted limits is to be taken. The even sections within the twenty-mile limits will, under the Act 3d March, 1853, 'An act to extend pre-emption rights to certain lands therein mentioned,' be increased to $2.50 per acre, and subject to the provisions of the pre-emption and homestead laws at that price. Mineral lands, other than coal and iron, are excluded from this grant. I do not think it necessary at this time to pass upon the question as to whether this railroad company have adopted the route of any other railroad. Any identity of grant arising out of conflict of location under the first proviso in the third section of the act will be reserved for future consideration. The withdrawal will be ordered to take effect upon the receipt of your instructions at the local office.

"Very respectfully, your obt. servant,     O. H. Browning, Secretary.

"Hon. Jas. S. Wilson, Commissioner of the General Land Office."

And the bill alleges that the odd-sectioned lands within 30 miles of the said route of the complainant's road "have ever since so remained withheld and withdrawn." The bill also sets forth the joint resolution of congress of June 28, 1870 (16 Stat. 382), by which complainant was authorized to "construct its road and telegraph lines as near as may be on the route indicated by the map filed by said company in the department of the interior on the 3d day of January, 1867," and alleges that the road was built by the complainant upon the line as shown upon that map, and, as constructed, ran through Tulare county, which is within the district of lands subject to sale at Visalia, Cal., and was completed within the time limited by the acts of congress, which fact was duly reported to the president, and by him accepted and approved; that the land in controversy is more than 20, but within 30, miles of the complainant's road, as so located and constructed, and that when its route was definitely fixed the said land had not been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of or appropriated by the United States for any purpose, but that the United States then had full title thereto; that the entire indemnity limits under the grant to the complainant are insufficient to supply the losses sustained by it within the granted limits, and that the commissioner of the general land office, in his annual report to the president and to the interior department for the year 1883, "has attested and certified to the fact that the land within the indemnity limits in said act of July 27, 1866, will by no means supply the loss of lands within the twenty-mile limits to said railroad company under said act";

that the respondent Groeck filed a declaratory statement, No. 7,974, upon the land in controversy, alleging settlement thereon September 2, 1885; that complainant contested Groeck's right to the land in the local land office, as also, by appeal, throughout the department of the interior, but that that department, disregarding the law, awarded the land to Groeck, and on the 11th day of April, 1890, a patent therefor was issued to him. The bill further alleges that on the 13th of January, 1891, complainant selected the land in controversy in its indemnity list No. 43, at the land office in Visalia, which office refused to approve the selection, although complainant offered all the fees for the purpose of listing, selecting, and securing a patent for the land, and that a like refusal has been made by the commissioner of the general land office, and by the secretary of the interior.

Although the bill alleges that the order of withdrawal of the odd sections within 30 miles of the route of the complainant's road, as delineated on the map filed by it January 3, 1867, made by Secretary Browning, March 19, 1867, has ever since remained in force, and although, for the purpose of disposing of a demurrer, the rule is that such facts as are well pleaded are to be taken as true, yet where, by a public record, of which the court takes judicial notice, the fact is shown to be otherwise, the general rule should not, I think, be held to apply. The acts of the secretary of the interior done in the performance of his official duty are matters of which the courts may take judicial notice. Caha v. U. S., 152 U. S. 211, 221, 222, 14 Sup. Ct. 513. And a reference to the records of the department of the interior shows that the order of withdrawal made by Secretary Browning on the 19th of March, 1867, was revoked, and the lands included in that order directed to be restored to the public domain by an order made by his successor, Secretary Cox, on the 2d day of November, 1869, as appears from a certified copy of that order on file in another case in this court. The reason assigned by Secretary Cox for his action in that particular was that in locating the route of its road the complainant company "had entirely disregarded its charter from the state of California, which, in the act of congress of July 27, 1866, making the grant of lands, is given as its authority to build a road in California"; and it was doubtless due to that fact that the subsequent acts of the legislature of the state of California, set out in complainant's bill, changing the charter of the company, and authorizing it to change its route, were passed, as also the joint resolution of congress of June 28, 1870, authorizing it to build upon the route delineated on the map filed by it January 3, 1867. From this statement it will be seen that at the time the line of complainant's road was definitely fixed the land in controversy, which was without the primary, but within the indemnity, limits of the grant, was public land, to which the United States had full title; that at the time the defendant Groeck first settled upon the land there was no order of the interior department in force withdrawing it from sale, pre-emption, or homestead entry; and that at the time of the defendant Groeck's settlement upon the land there had been no attempt on complainant's part to select it

in lieu of any land lost to it within the primary limits of its grant, or at all, although complainant contested Groeck's right to pre-empt the land before the local office, as also, by appeal, before the commissioner of the general land office and the secretary of the interior. If, however, the law making the grant itself operated to withdraw the odd sections within the indemnity limits of the grant from sale, pre-emption, homestead entry, or other disposition, it is obvious that no order of the secretary was needed to work that result.    And that the statute itself did so operate was held by this court in the case of Railroad Co. v. Araiza, 57 Fed. 98, following, as the court thought, the ruling of the supreme court in the cases of Buttz v. Railroad Co., 119 U. S. 72, 7 Sup. Ct. 100, and St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 18, 11 Sup. Ct. 389.    The Araiza Case was, however, rightly decided upon the facts as there made to appear, regardless of the construction of the act of congress; for in that case the attention of the court was not called to the fact that the order made by Secretary of the Interior Browning on March 19, 1867, directing the withdrawal of the odd sections within the indemnity as well as the primary limits of the grant for the benefit of the grantee, was on November 2, 1869, revoked by order of Secretary Cox.    On the contrary, it appeared in the Araiza Case, as stated by the court (57 Fed. 101), that at the time the defendant in that case first went upon the land the order withdrawing it from sale, pre-emption, or homestead entry was in force.    For that reason, if for no other, it was there properly held that the defendant acquired no right by her entry.    That such an order of withdrawal, while in force, is sufficient to defeat a settlement for the purpose of pre-emption or homestead entry, even if it shall afterwards be found to have been wrongfully made, was decided by the supreme court in the very recent case of Wood v. Beach (decided March 4, 1895) 156 U. S. 548, 15 Sup. Ct. 410.

In the present case, however, it is made to appear that there was no order of withdrawal made by the interior department in force at the time of the settlement by the defendant Groeck upon the land in controversy.    Was it withdrawn from such settlement by operation of the statue itself?    The act of July 27, 1866, did not direct the secretary of the interior to make any order withdrawing the lands that might fall within the grant from sale, pre-emption, homestead entry, or other disposition.    But, by its sixth section, it provided "that the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad, and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting pre-emption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twentieth, eighteen hundred and sixty-two, shall be, and the same are hereby extended to all other lands on

the said line of said road when surveyed, excepting those hereby granted to said company."

The ruling of this court in the Araiza Case, above cited, that the act of congress making the grant to the complainant company itself operated to withdraw, for the benefit of the grantee, from sale, preemption, or homestead entry, the odd sections of land situated within the indemnity as well as within the primary limits of the grant, was, as has been said, based upon the ruling of the supreme court of the United States in the cases of Buttz v. Railroad Co., 119 U. S. 55, 7 Sup. Ct. 100, and St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 389. It is now insisted on the part of the defendants that this court, in the Araiza Case, wrongly construed those decisions of the supreme court; that the land involved in the Buttz Case was situated in the then territory of Dakota, and that, as the grant to the Northern Pacific Railroad Company was for 20 odd sections of land on each side of the road where it passes through a territory, the primary limits of the grant in the territories extended 40 miles on each side of the road, and therefore the land involved in the Buttz Case was within the primary limits of the grant to the Northern Pacific Railroad Company; and that the decision of the supreme court in that case that the act of congress itself operated to withdraw the odd sections of land situated within 40 miles of the line of the road applied only to lands within the primary limits of the grant. It is true that in Dakota (Dakota then being a territory) the primary limits of the grant to the Northern Pacific Company extended 40 miles on each side of the road, and that the particular piece of land involved in the Buttz Case was within those limits. But the supreme court, as will be seen from its opinion, was construing the act of congress making the grant to the Northern Pacific Railroad Company, the contemplated as well as the completed route of which passed through a state, where the grant was limited to 10 odd sections a mile on each side of the road, as well as through territories where it was for 20 odd sections a mile on each side of the road. "The act of congress," said the court (119 U. S. 71, 7 Sup. Ct. 100), "not only contemplates the filing by the company, in the office of the commissioner of the general land office, of a map showing the definite location of the line of its road, and limits the grant to such alternate odd sections as have not, at that time, been reserved, sold, granted, or otherwise appropriated, and are free from pre-emption, grant, or other claims or rights, but it also contemplates a preliminary designation of the general route of the road, and the exclusion from sale, entry, or pre-emption of the adjoining odd sections, within 40 miles on each side, until the definite location is made." This was said with reference to the grant as a whole, and was not limited to any particular section of the road, whether located in a territory or in a state. The court proceeded:

"The third [sixth] section declares that after the general route shall be fixed the president shall cause the lands to be surveyed, for forty miles in width, on both sides of the entire line, as fast as may be required for the construction of the road, and that the odd sections granted shall not be liable to sale, entry, or pre-emption, before or after they are surveyed, except by the company. The general route may be considered as fixed when its general course and direction

are determined after an actual examination of the country, or from a knowledge of it, and is designated by a line on a map showing the general features of the adjacent country, and the places through or by which it will pass. The officers of the land department are expected to exercise supervision over the matter, so as to require good faith on the part of the company in designating the general route, and not to accept an arbitrary and capricious selection of the line, irrespective of the character of the country through which the road is to be constructed. When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing the map thereof with the commissioner of the general land office, or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections, to the extent of forty miles on each side. The object of the law in this particular is plain. It is to preserve the land for the company to which, in aid of the construction of the road, it is granted. Although the act does not require the officers of the land department to give notice to the local land officers of the withdrawal of the odd sections from sale or pre-emption, it has been the practice of the department, in such cases, to formally withdraw them. It cannot be otherwise than the exercise of a wise precaution by the department to give such information to the local land officers as may serve to guide aright those seeking settlements on the public lands, and thus prevent settlements and expenditures connected with them which would afterwards prove to be useless. Nor is there anything inconsistent with this view of the sixth section as to the general route, in the clause in the third section making the grant operative only upon such odd sections as have not been reserved, sold, granted, or otherwise appropriated, and to which pre-emption and other rights and claims have not attached when a map of the definite location has been filed. The third section does not embrace sales and pre-emptions in cases where the sixth section declares that the land shall not be subject to sale or pre-emption. The two sections must be so construed as to give effect to both, if that be practicable."

In the later case of St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 17, 11 Sup. Ct. 389, where the land involved was situated in the state of Minnesota, and where the primary limits of the grant to the Northern Pacific Company extended only 20 miles on each side of the road, the supreme court, in considering the same grant, said:

"The withdrawal made by the secretary of the interior of lands within the forty-mile limit on the 13th of August, 1870, preserved the lands for the benefit of the Northern Pacific Railroad from the operation of any subsequent grants to other companies not specifically declared to cover the premises. The Northern Pacific act directed that the president should cause the lands to be surveyed forty miles in width on both sides of the entire line of the road, after the general route should be fixed, and as fast as might be required by the construction of the road, and provided that the odd sections of lands granted should not be liable to sale, entry, or pre-emption before or after they were surveyed, except by the company. They were therefore excepted by that legislation from grants, independently of the withdrawal by the secretary of the interior. His action informally announcing their withdrawal was only giving publicity to what the law itself declared. The object of the withdrawal was to preserve the land unincumbered until the completion and acceptance of the road."

And, after referring to what the court had ruled in the previous case of Buttz v. Railroad Co. in respect to the withdrawal of the lands, added:

"After such withdrawal no interest in the lands granted can be acquired, against the rights of the company, except by special legislative declaration, nor, indeed, in the absence of its announcement after the general route is fixed."

And the court, in the St. Paul & P. R. Co. Case, further held, in answer to the objection that no evidence was produced of any selection by the secretary of the interior from the indemnity lands to make up for the deficiencies found in the lands within the place limits, that:

"It is sufficient to observe that all the lands within the indemnity limits only made up in part for these deficiencies. There was therefore no occasion for the exercise of the judgment of the secretary in selecting them, for they were all appropriated."

It does not seem to me that the language used by the supreme court in these cases admits of any other construction than that the odd sections included within the indemnity as well as the primary limits of the grant to the Northern Pacific Company were withdrawn, for the benefit of the grantee, from sale, pre-emption, homestead entry, or other disposition. Indeed, one of the counsel for the defendants, in one of the briefs filed in this case, admits that in the case last cited the supreme court held "that, as between railroads, the withdrawal from operation of law upon filing map of general route under the senior grant operated to except all the lands in the indemnity as well as primary limits from the operation of the junior grant," but, he adds, "this must be true as between railroads, in view of the terms of the grant excluding lands previously granted, reserved, or claimed at the time of filing map of definite location by the railroad at the time of the junior grant." This latter observation of counsel is answered by the decision of the supreme court in the Buttz Case that there is nothing inconsistent with its view of the sixth section of the act "in the clause in the third section making the grant operative only upon such odd sections as have not been reserved, sold, granted, or otherwise appropriated, and to which pre-emption and other rights and claims have not attached when the map of the definite location has been filed. The third section does not embrace sales and pre-emptions in cases where the sixth section declares that lands shall not be subject to sale or pre-emption." A withdrawal, however made, before the line of road is definitely fixed, is, as said by this court in the Araiza Case, "as applicable to lands within the indemnity limits as to those within the primary limits of the grant; for up to that time the grant is no more attached to specific tracts of the one class of lands than of the other, neither being in any way identified." The sixth section of the act of July 2, 1864 (13 Stat. 365), making the grant to the Northern Pacific Company, being in substance, and almost literally, the same as the sixth section of the act of July 27, 1866, making the grant to the Southern Pacific Railroad Company, the language of the supreme court above quoted is equally applicable to the act in question here (U. S. v. Southern Pac. R. Co., 146 U. S. 600, 13 Sup. Ct. 152), and renders necessary, in my opinion, the conclusion announced in Railroad Co. v. Araiza, supra.

If, as counsel for defendants insist should be done, the ruling of the supreme court referred to—that where, as here, the loss of lands within the granted limits is so great that all the lands included within the indemnity limits are insufficient to make good the loss, there is no occasion for the exercise of the judgment of the secretary of the interior in selecting from them, because, in such case, they are all appropriated—be regarded as unnecessary to the decision in that case, still, in the present case, according to the averments of the bill, the complainant sought to select the land in controversy in lieu of land lost to it within the primary limits

of the grant, at the same time tendering all lawful fees, which selection was by the land department refused. Such refusal, if the right exists, entitled the company to resort to a court of equity for relief. Van Wyck v. Knevals, 106 U. S. 360, 1 Sup Ct. 336; Smelting Co. v. Kemp, 104 U. S. 636. But such application must be seasonably made (Curtner v. U. S., 149 U. S. 676, 13 Sup. Ct. 985, 1041); and it is here contended that it was not. This attempt on the part of the complainant to select the land in controversy was not made until the 13th day of January, 1891, although it contested defendant Groeck's right to the land in the local land office, as also, by appeal, throughout the department of the interior. This ineffectual effort in the department of the interior against the allowance of Groeck's entry was neither a selection of the land by complainant, nor, under the decision of the supreme court in Curtner v. U. S., supra, can it be held to relieve complainant of the plea of laches in the assertion of its rights. According to the averments of the bill, the land in controversy was withdrawn for complainant's benefit as early as 1867. On September 2, 1885, it was settled upon by the defendant Groeck; was patented to him by the United States April 11, 1890; and yet complainant never sought to select it until January 13, 1891,—nearly 25 years after the withdrawal of the land for complainant's benefit, and more than 5 years after the defendant Groeck's adverse entry upon it, according to the averments of the bill, which bill was not filed until more than a year thereafter, to wit, February 11, 1892. The bill contains no allegation as to when it was first discovered that all of the lands within the indemnity limits of the grant were insufficient to make good the loss sustained by complainant of lands within the primary limits, but it does allege that that fact was attested and certified to by the commissioner of the general land office in his annual report for the year 1883 to the president and to the department of the interior. Applying the rule announced by the supreme court in the case of St. Paul & P. R. Co. v. Northern Pac. R. Co., supra, to that fact, it is apparent that complainant's cause of suit existed at least as early as September 2, 1885, when defendant Groeck made his adverse settlement upon the land as a pre-emptor. Yet complainant waited until February 11, 1892, before bringing this suit to establish its claim to the land,—more than $6\frac{1}{2}$ years,—a period considerably longer than that prescribed by the statute of California for the bringing of an action for the recovery of real property. Code Civ. Proc. Cal. §§ 318, 319, 343, 738. Nor does the bill show any reason why its right of selection was not sooner exercised. As already said, it shows that as early as the year 1867 the lands included within the indemnity limits of its grant were withdrawn for complainant's benefit; but whether its right of selection was deferred by reason of the failure of the government to make a survey of the lands, or whether, for any other cause, complainant's failure to make the selection within a reasonable time was excused, is nowhere shown. The fact remains that it was not until February 11, 1892, that complainant came into a court of equity to enforce its rights to the land in question. Unless there be some excuse not disclosed by the bill

as presented, it waited too long.    As said by this court in De Estrada v.·Water Co., 46 Fed. 280:

"It is true that the statutes of limitations applicable to actions at law do not apply to suits in equity, but courts of equity are governed by the analogies of such statutes.    Norris v. Haggin, 136 U. S. 386, 10 Sup. Ct. 942.    'A court of equity,' said Lord Camden, 'has always refused its aid to stale demands where the party slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence.    Where these are wanting the court is passive, and does nothing.    Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court.' "

This doctrine has been repeatedly recognized and acted on by the supreme. court.    Curtner v. U. S., 149 U. S. 676, 13 Sup. Ct. 985, 1041; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, and cases there cited.    Demurrer sustained, with leave to the complainant to amend within the usual time, if it shall be so advised.