CRAIN et al. v. UNITED STATES.
No. 45300.

Court of Claims.
April 6, 1942.

Geo. E. H. Goodner, of Washington, D. C. (D. F. Prince and Scott P. Crampton, both of Washington, D. C., on the brief), for plaintiff.

Joseph H. Sheppard, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty.

322

Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

Plaintiffs as trustees of a common law business trust doing business under the trade name of Lee Wilson & Company, seek to recover the amount paid for tax exemption certificates issued under the Bankhead Cotton Act, 48 Stat. 598, 7 U. S.C.A. §§ 701–723.

The act became effective April 21, 1934. It imposed a tax at the rate of 5.67 cents per pound[1] upon the ginning of cotton from the 1934-35 crop produced and marketed in excess of amounts allotted by the Secretary of Agriculture. The amount of cotton exempted from tax was fixed under the terms of the act at 10,000,000 bales for the year involved.

The requirements of the law could be satisfied either by the payment of the amount of the tax or by the surrender of tax exemption certificates which were transferable. Upon receipt of payment in cash or upon the furnishing of a tax exemption certificate bale tags were issued. Cotton could not be moved into commerce without a bale tag affixed thereto.

Ten million tax exemption certificates were issued by the Secretary of Agriculture to cover an equal number of bales. The Commissioner of Internal Revenue collected all taxes. If anyone held an exemption certificate for a bale of cotton no tax was paid to or collected by the Commissioner on such bale. The exemption certificates were allotted to individual farmers and became the property of such farmers. They were negotiable.

If a farmer produced more than his allotted share of what it was estimated the market would absorb in any one year, this extra production was classed as surplus cotton. The farmer who produced it had a choice of three courses: (1) He could sell it in the open market, in which event he paid the tax; (2) he could purchase tax exemption certificates from a farmer who had not produced the amount of his quota, or from a pool of such certificates; or (3) he could take the surplus production home and store it on his farm or in a public warehouse without paying the tax and could include it within his quota for the following year and thus market it without tax payment.

If a farmer produced less than his market allotment, he could dispose of his excess certificates in one of two ways: (1) He could surrender the excess certificates to a pool established by the Secretary of Agriculture, in which event he would participate proportionately in the net proceeds of the sale of certificates made by the pool manager to farmers who had produced more than their allotment; or, (2) with the approval of the county agent, he might sell them to another farmer, if one could be found in his locality who had produced more than his allotment, in which event he received the full proceeds of the sale without any deduction for expenses. Thus whether the individual farmer voluntarily joined the pool or chose to sell his excess certificates to another farmer, in neither event did the Government have any interest in the proceeds.

Plaintiffs allege that since 1934 Lee Wilson & Company have been engaged in the production, ginning, and sale of cotton; that the Department of Agriculture established a pool under the provisions of the Bankhead Cotton Act for the purpose of enabling producers of cotton to purchase tax exemption certificates; that on various dates plaintiffs purchased on behalf of Lee Wilson & Company and its tenants tax exemption certificates in the aggregate sum of $67,326.24; that of the aforesaid sum $1,402.92 was expended to purchase certificates of exemption for plaintiffs' tenants, and the balance, $65,923.32, for certificates for the use of the trust; that certificates were paid for by checks made payable to the pool manager and were endorsed by him over to the general fund of the Treasury of the United States; and that plaintiffs surrendered the tax exemption certificates so purchased to the Collector of Internal Revenue in payment of the ginning tax on cotton, and received bale tags which were affixed to the cotton.

It is further averred that the Department of Agriculture offered inducements to tax payers to purchase certificates of exemption; that the payments were made under duress of goods and compulsion, that

[1] 50 per centum of the average price at central markets, but not less than 5 cents per pound.

the Bankhead Cotton Act has been held unconstitutional and has been repealed, and that timely application for refund of the amount paid for the certificates was made and was rejected.

Plaintiffs sue to recover $65,923.32 expended in the manner indicated.

The Bankhead Act was repealed February 10, 1936, 49 Stat. 1106.

The Supreme Court has not passed directly upon the constitutionality of the Bankhead Cotton Act. True, in the case of United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, the Supreme Court held that the processing tax provisions in the Agricultural Adjustment Act of 1933, 7 U.S.C.A. § 601 et seq., were invalid. In that act (48 Stat. 31), however, the taxes were levied on the processing of all of the commodity that was produced with a drawback on that portion which flowed into foreign markets. The resulting funds were used to make benefit payments to farmers who limited or curtailed production. Emphasis was placed on reduced production. The first powers conferred on the Secretary of Agriculture in the 1933 act were "to provide for reduction in the acreage or reduction in the production for market, or both, of any basic agricultural commodity." Section 8. The court held that the processing fees were intimately linked to control of production which the court held to be a local matter and without the scope of Congressional powers.

The Bankhead Cotton Act provided for tax on the ginning of the *excess* or surplus production only. It was to be collected only if the surplus was to be marketed or moved into commerce. Its first stated purpose was "to promote the orderly marketing of cotton in interstate and foreign commerce". It placed emphasis on commerce. The second Agricultural Adjustment Act, known as the Agricultural Adjustment Act of 1938, 52 Stat. 31, 7 U.S.C.A. § 1281 et seq., followed largely the same pattern as the Bankhead Act. It provides penalties on the marketing of surplus production. It also emphasizes commerce.

■ In United States v. Darby, 312 U. S. 100, 113, 657, 61 S.Ct. 451, 456, 85 L.Ed. 609, 132 A.L.R. 1430, it was held that the power of regulating interstate commerce extends even to the point of prohibiting it. We quote: "While manufacture is not of itself interstate commerce, the shipment of manufactured goods interstate is such commerce and the prohibition of such shipment by Congress is indubitably a regulation of the commerce. The power to regulate commerce is the power 'to prescribe the rule by which commerce is to be governed'. Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23. It extends not only to those regulations which aid, foster and protect the commerce, but embraces those which prohibit it."

In the case of Mulford v. Smith, 307 U. S. 38, 59 S.Ct. 648, 83 L.Ed. 1092, the Supreme Court upheld the provisions of the Agricultural Adjustment Act of 1938, which levied a penalty of 50% on the marketing of tobacco produced in excess of the quotas allotted to producers, on the ground that Congress had provided for the levy in the exercise of its power to regulate interstate commerce. The penalties levied under the provisions respecting tobacco in the Agricultural Adjustment Act of 1938 were similar to the so-called taxing provisions of the Bankhead Cotton Act. The levies in each act were authorized under the same powers and were enacted for the same purpose. In order for plaintiff to be entitled to recover from the general fund of the Treasury, as for taxes illegally assessed and collected, it would be necessary to hold the taxing provision of the Bankhead Cotton Act invalid. We are not inclined to so hold. In the light of the decisions in the Mulford and Darby cases, supra, we do not-think the plaintiffs are justified in assuming—as the meager presentation of the question in their brief shows they do—that the Bankhead Act was unconstitutional.

■ However, in view of the allegations in the petition, it is unnecessary to hinge the decision on that uncertainty. Whether the act was valid or invalid, we do not think the United States Government is obligated to pay to the plaintiff such sums out of the general fund of the Treasury. The plaintiffs paid no tax. They simply purchased tax exemption certificates.

In the Second Deficiency Appropriation Act for the fiscal year 1938, 52 Stat. 1114, 1150, an appropriation was made for the purpose of refunding all amounts collected by the Collector of Internal Revenue as taxes under the Bankhead Cotton Act. The appropriation was conditioned, among other things, by the following: "Provided further, That in the absence of fraud all

findings of fact and conclusions of law of the Commissioner of Internal Revenue upon the merits of any such claim for refund, and the mathematical calculations made in connection therewith, shall not be subject to review by any court or by any other officer, employee, or agent of the United States: Provided, further, That no refund of any tax shall be made under this paragraph unless liability for the payment of such tax was satisfied by the payment of money."

The defendant insists that since the Commissioner has found against the plaintiffs, and since the plaintiffs did not pay the money in cash to the Collector of Internal Revenue, they are precluded from recovery by both of the above quoted restrictions.

Plaintiffs insist that the appropriation by its terms was applicable only to those who had paid the tax directly to the Collector of Internal Revenue in cash, that therefore the restrictions were applicable only to those who had so paid the tax, and that the Appropriation Act contained no direct provision as to bale tags that were secured by the use of tax exemption certificates. Plaintiffs further insist that they are not suing under the Second Deficiency Act which was not intended to cover them, but that they are seeking to recover under Section 145 of the Judicial Code, Title 28 U.S.C.A. § 250.

If plaintiffs paid the tax they are precluded from maintaining suit for recovery by the plain provisions of the Second Deficiency Appropriation Act.[2] The legislative feature of that act, 52 Stat. 1114, 1150, authorized filing of claim for refund of any taxes paid under the Bankhead Cotton Act, but made final, in the absence of fraud, any action by the Commissioner on the merits of the claim. Plaintiffs filed claim for refund which was rejected by the Commissioner.

We are inclined to agree with plaintiffs that they do not come within the provisions of the Second Deficiency Act, and are therefore not limited by its provisions.

However, in taking themselves outside of the inhibitions of the act, they practically take themselves out of the taxpaying category. They endeavor to take themselves away from the restrictions of the Second Deficiency Act by showing that they did not pay the tax in money, and at the same time endeavor to recover under the general provision of law by alleging that "the liability of plaintiffs for the payment of said ginning tax on cotton was satisfied by the payment of money."

Under the terms of the act ten million bales of cotton were not taxed. This number of tax exemption certificates was delivered to farmers throughout the cotton producing area, and if only 10,000,000 bales had been produced and marketed in 1935 no tax would have been collected. Both the r 'ing and the pooling of the certificates were a redistribution or a reallotment of tax free cotton.

The plaintiffs chose to purchase these exemption certificates at 4 cents per pound rather than pay the tax of 5.67 cents per pound.

The tax exemption certificate pool which was established by the Secretary of Agriculture pursuant to the act, and upon which plaintiffs base their suit, was established to provide facilities for the transfer of the surplus certificates, and not for the purpose of collecting revenue. Its nature and terms are set out in the official regulations issued and printed by the Secretary of Agriculture, the particular regulations being B.A. 19C, dated September 5, 1934.

The first paragraph of Section 104 of such regulations provides for the establishment of a tax exemption certificate pool.

Paragraph (a) of such section provides for a manager and stipulates that "Such manager shall receive and manage and sell or dispose of surplus certificate(s) under trust agreements executed (on a prescribed form) by the several producers participating in the pool."

Subsequent paragraphs set out the details of voluntary participation.

Paragraph (g) provides that the checks made out to the pool manager by those who purchased the certificates shall be deposited with the Treasurer of the United States through the Comptroller of the Agricultural Adjustment Administration, Department of Agriculture, *under a symbol number* [italics supplied], and the disbursements from such fund whether on account of expenses or dividends to producers shall be made upon voucher drawn by the Manager of the pool.

---

[2] Cook v. United States, 5 Cir., 115 F.2d 463.

Paragraph (g) contains the further provision that "All accounts involved in such receipts, the handling of such funds, the payment of expenses, the determination of each producer's pro rata share of the net returns from the pool, and the issuance of checks in settlement of such shares shall be under the direction of said Comptroller. All expenses incident to the operation of the pool (but not including salaries of the manager or the Assistants in Cotton Adjustment) shall be deducted from the gross receipts."

Paragraph (h) provides that "The funds remaining in the pool, after deduction of all such expenses as provided above, shall be distributed pro rata to producers in the proportion which the number of pounds represented by the certificate(s) surrendered into the pool by each producer bears to the total number of pounds represented by all certificates surrendered into the pool."

The regulations under which the tax exemption certificate pool was established show that the pool was established—September 5, 1934, after the cotton picking season began—for the benefit of the producers and to prevent some of them from becoming the victims of speculators. They show conclusively that the money was not collected as taxes, but simply placed in a fund and each holder of a certificate given in exchange for surrendering his certificate to the pool an evidence showing that he had an undivided interest in the proceeds of the pool. The regulations show that the money was to be used first for the payment of the expense of operating the pool and the balance was to be distributed share and share alike among the holders of the certificates in proportion to the number surrendered by them. The funds were deposited in a special account. In no other way could vouchers or warrants be issued without additional appropriative action on the part of the Congress. In fact the regulations show the establishment of such special account.

■ It is true that plaintiffs allege in a general way that the funds were placed in the general funds of the Treasury. However, their entire case is bottomed on the establishment and operation of the tax exemption certificate pool. A general allegation in the petition that is in direct conflict with the terms of the statute on which they rely and the regulations issued thereunder and which latter furnish the basis for their cause of action is insufficient even for the purposes of demurrer.[3] The regulations, by the terms of which the pool was established, not only do not authorize the placing of any sums arising from the sale of exemption certificates in the general fund of the Treasury, but specifically provide for a special account as well as the method and purpose of disbursement.

If the purchase of these certificates were construed to be a tax then an even more serious question would be presented. The official records of the Department of Agriculture show that more certificates were sold by individual farmers in direct dealings with each other than were sold through the pool, pool transactions amounting to approximately twenty-two million dollars and direct transactions between farmers to approximately thirty million dollars. In the direct purchase and sale between farmers the Department neither participated in nor handled any of the funds. Yet these farmers stand on the same basis as those who purchased from the pool. If there was compulsion in the one case there was compulsion in the other. Is the Government to be liable to each of these farmers? Is the Government to be subjected to the claims of thousands · of cotton farmers throughout the cotton producing area who participated in these transactions? What a tangled skein of confusion results when any effort is made to handweave such a pattern.

The sums collected on the cotton that was produced and marketed in excess of 10,000,000 bales were taxes, intended and collected as such, and as such went into the general fund of the Treasury. All these collections were returned to the taxpayers by direct appropriation. The proceeds of the sale of the tax exemption certificates were an entirely different fund.

It is as if the manager of a show, the price of admission to which was sixty cents, handed a complimentary ticket to A. Not being in a position to use it, A sells it to B for 40 cents. The show is cancelled. Cash tickets are redeemed. B presents his ticket at the window and asks for a refund. The manager would prob-

---

[3] Pennie v. Reis, 135 U.S. 464, 10 S.Ct. 149, 33 L.Ed. 426; Southern Pac. R. Co. v. Groeck, C.C., 68 F. 609.

ably say he received none of the funds in the first place. B was not compelled to buy a ticket. He was only required to buy a ticket if he went to the show.

Plaintiffs were not required to pay a tax or buy a certificate. It was only necessary to do so if they wanted to sell more than their share of what the market would absorb that year.

We find no compulsion here. For generations the farmers have been bound down by surpluses with which they were powerless to deal. Glutted markets and ruinous prices were followed by waste and then scarcity with injury to both producer and consumer. Rotting surpluses followed by scarcity and want didn't make sense. As individuals, numerous and widely scattered, farmers were helpless. Modern improved methods had aggravated the problem. Agriculture was prostrate.

A program was fashioned—crude in its beginnings, perhaps, but a program—to apportion the market, yoked to the demand or consumptive need. Linked to the program was a loan feature to carry a reserve supply to assure against shortage.

An effort was made in the instant act to apportion the market among the farmers on a fair basis. If a producer went along with his neighbors and used only his share of the market he was not taxed. If he tried to ride the sacrifices of the other producers by intentionally marketing large excess volumes he was to be taxed. He was out of step and deserved to be taxed.

The normal consumptive demand or market—10,000,000 bales for that year—was not to be taxed. Above that the tax was to be effective.

Some who were allotted certificates would, on account of drought, flood or other mishap, be unable to use their certificates. Others would find a more fortunate season. Hence the exchange or sale of certificates. These amounts were usually small. The man who was a little more fortunate would not mind sharing his good fortune with his less favored neighbor. He was marketing a little more than his share while the man who sold the certificates was marketing a little less. All this money was to go to the farmers, none of it to the Government. But when the amount offered in the market rose above the ten million bales, the excess was to be taxed and the proceeds placed in the general fund of the Treasury.

No one was forced to pay a tax. If he found himself with more cotton than was his share of the market in one year, and really wanted to cooperate, he could hold it over and market it within his quota the following year without paying any tax and without purchasing any certificate. This is all shown in the text of the act and the general act which it supplements. Does this seem commonplace? It is the heart of one of the great movements of modern times.

The Government collected no tax in connection with the tax exemption certificates. Not one penny of the amount paid into the pool went into the general fund of the Treasury of the United States. Taxes are collected by the Commissioner of Internal Revenue or under his direction. The pool funds were handled by the Secretary of Agriculture.

The substance of plaintiffs' suit is a direct drive against the general fund of the United States Treasury as if for money had and received as taxes. As such it is barred by the restrictive provision of the Second Deficiency Act. Realizing this they take themselves out of this classification by their allegations and brief, and at the same time endeavor to cling to the general fund of the Treasury into which none of the sums for which they sue has ever been paid. Plaintiffs' allegations are insufficient to establish an obligation on the part of the United States by way of a contract, either express or implied in fact, to subject the general fund of the Treasury to the payment of the sums which they seek to recover.

The United States had no pecuniary interest in the fund as such. Its officers were merely trustees of a fund belonging to others.

Whether the plaintiffs have any legal interest in the trust fund, or in the balance thereof, if any part of it remains undistributed, is not before the court and is therefore not determined.

Defendant's demurrer to plaintiffs' petition is sustained and the petition is dismissed.

It is so ordered.

WHALEY, Chief Justice, and LITTLETON, Judge, concur.

MADDEN, Judge (concurring).

I concur in the result reached by the Court. I would place that result upon the

ground that no showing has been made to us sufficient to overcome the presumed constitutionality of the Bankhead Act. Since the invalidity of that Act is the major premise of plaintiff's claim, I think we are not faced with the question of whether or not the exaction which plaintiff seeks to recover is a tax, or whether, tax or something else, it would be recoverable if it had been illegally exacted. I would, therefore, not decide those questions.

WHITAKER, Judge (dissenting).

I am unable to agree with the majority. I think the demurrer should be overruled.

The purpose of the Bankhead Cotton Control Act was to restrict the production of cotton, not to raise revenue; but it sought to accomplish this purpose through the exercise of the taxing power. In order to restrict the production of cotton, it levied a prohibitive tax on cotton produced in excess of the farmer's quota.

It made provision for satisfying this tax in two ways: (1) by payment of it in money; or (2) by payment of it in tax-exemption certificates, which could be purchased from a farmer who had not raised his quota, either directly or through the pool; but, whether the tax was satisfied in money or in certificates, it was liability for a tax that was discharged. Whatever it cost a taxpayer to discharge his liability for the tax, I think he is entitled to recover.

It makes no difference that the defendant received no pecuniary benefit from the transaction. It was not looking for pecuniary benefit. It was seeking the restriction of the production of cotton. This result was accomplished. To accomplish it cost the plaintiffs the sum for which they sue. It was a sum exacted from them under the taxing power of the defendant. As Justice Sutherland said in United States v. Updike, 281 U.S. 489, 494, 50 S.Ct. 367, 369, 74 L.Ed. 984, "Certainly it would be hard to convince such a person that he had not paid a tax." See, also, Stahmann v. Vidal, 305 U.S. 61, 59 S.Ct. 41, 83 L.Ed. 41.

If the allegation in the petition that the Act was unconstitutional is true, I think it states a good cause of action and that the demurrer should be overruled.

I have no doubt that it was unconstitutional under the authority of the Butler[1] case. Both the Bankhead Act and the first Agricultural Adjustment Act contained exactly the same vices denounced by the Supreme Court in that case.

The Fifth Circuit Court of Appeals held the Act unconstitutional in United States v. Moor, 93 F.2d 422, as did also the Court of Appeals for the District of Columbia in Thompson v. Deal, 67 App.D.C. 327, 92 F.2d 478. In Stahmann v. Vidal, supra, the Supreme Court assumed, but did not decide, it to be unconstitutional.

The taxes having been exacted under an unconstitutional statute, I think the plaintiffs are entitled to recover if the allegations of their petition are proven.

Wherefore, I think the demurrer should be overruled.

