# UNITED STATES *v.* BEEBE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF ARKANSAS.

No. 180.  Argued February 10, 13, 1888.—Decided April 30, 1888.

The Attorney General has authority, under the Constitution, to file a bill in
equity in the name of the United States to set aside a patent of public
land alleged to have been obtained by fraud or mistake, when the gov-
ernment has a direct interest in the tract patented, or is under an obliga-
tion respecting the relief invoked by the bill.

The United States are not bound by any statute of limitations, nor barred
by laches of their officers in a suit brought by them, as sovereign, to
enforce a public right, or to assert a public interest; but where they are
formal parties to the suit, and the real remedy sought in their name is
the enforcement of a private right for the benefit of a private party,
and no interest of the United States is involved, a court of equity will
not be restrained from administering the equities between the real
parties by any exemption of the government, designed for the protection
of the rights of the United States alone.

THIS was a suit in equity brought by the Attorney General
on behalf of the United States to set aside and cancel certain
patents issued in favor of Roswell Beebe, in 1838 and 1839,
for about 480 acres of land upon which the present city of
Little Rock, Arkansas, is partly built. Roswell Beebe having
died many years ago, this suit is prosecuted against his heirs
and legal representatives. It was brought in the United
States Circuit Court for the Eastern District of Arkansas,
the bill having been filed on the 31st of January, 1883. The
ground upon which it was asked that said patents might be
set aside and cancelled was, that at the date of their issue,
and for a long time prior thereto, the United States did not
own the land embraced in them, but that, on the contrary,
said land was legally appropriated by other persons, and was
therefore segregated from the public domain; that said Ros-
well Beebe and others fraudulently conspired together for
the purpose of securing said patents, and by false representa-
tions, pretences, and undue influence persuaded and "coerced"

the register" of the United States Land Office at Little Rock into the belief that he (Beebe) was entitled to said patents, etc.; and that by reason of said premises said patents were fraudulent and void.

The bill set out at considerable length and with much regard to details a great array of alleged facts connected with the issue of said patents, the former appropriation of the land, and the alleged fraudulent acts and practices of said Beebe with reference to said land. In substance they were as follows: That said lands were formerly a part of the Quapaw Indian reservation, but were ceded to the United States by the treaty of August 24, 1818, and thereby became part of the public domain; that afterwards, to wit, in 1819 and 1820, they, with other lands not involved in this controversy, were located with what is known as "New Madrid Certificates" issued by the recorder of land titles at St. Louis in November, 1815, under and in accordance with the provisions of the act of Congress approved February 17, 1815, entitled "An act for the relief of the inhabitants of the late county of New Madrid, in the Missouri Territory, who suffered by earthquakes," 3 Stat. 211, c. 45; that by virtue of said locations all of said lands were surveyed, and the surveys were returned to the recorder on the 17th of October, 1820, whereby said lands became legally appropriated by the holders and owners of said certificates, and thus severed from the mass of the public domain; that the equitable title to said lands thus became vested in the locators of said certificates and their assigns, and was afterwards, by proper assignments and conveyances, transferred to and became vested in one W. M. O'Hara, who subsequently conveyed the lands in undivided moieties to Nathaniel Philbrook and Chester Ashley; that in 1824 said Philbrook died intestate, seized and possessed of an undivided half interest in said lands held under the title aforesaid, and the same descended to his father, Eliphalet Philbrook, a citizen of New Hampshire, and his sole heir at law, who, dying in 1828, by last will and testament devised all of his interest in and to said lands to Thomas H. Ellison and six of his other children and grandchildren; that said devisees

and heirs of such as are deceased have, by proper deeds, con-
veyed said lands to George V. Dietrich, Jabez C. Hurst, citi-
zens of Galesburg, Illinois, and John F. Calder, a citizen of
Troy, New York, in trust to apply for and obtain patents
thereto from the United States; that said trustees applied to
the United States recorder of land titles at St. Louis, Missouri,
for patent certificates in support of said original "New Ma-
drid" locations, and, on the 10th day of September, 1875, that
officer issued such certificates in the names of the original
locators and their legal representatives for said lands, as he
was authorized to do by the said act of February 17, 1815;
that afterwards said trustees made application for patents for
said lands to the proper United States authorities, but that
such patents were refused because of the existence of the out-
standing patents issued to said Beebe as aforesaid; that from
the time of said locations, surveys, and returns in 1819 and
1820, up until the issuance of the Beebe patents in 1838 and
1839, the said New Madrid locations were the only titles to
said lands, and under them the town of Little Rock was laid
out and built on said lands, was duly incorporated, and con-
tained hundreds of inhabitants prior to and at the time when
said patents were issued; that said Beebe patents were issued
on certain preëmption float claims, all located about the year
1838, under the provisions of the 2d section of the preëmp-
tion act of May 29, 1830, and the amendatory act of July 14,
1832; 4 Stat. 420, c. 208; 603, c. 246; but that such preëmp-
tion locations were fraudulent and void, because the lands had
already been appropriated by the New Madrid certificates,
were at that time occupied and improved by actual settlers,
and were consequently not subject to preëmption; that said
Beebe never procured the consent of said settlers to the loca-
tion of said preëmption floats, and the issue of said patents,
as required and provided by the said preëmption acts and the
regulations of the General Land Office, but on the contrary
imposed upon the officers of the Land Department, and in-
duced them to believe that he had complied with the law and
the regulations in every respect, when in fact his every act in
procuring said patents was done in violation of law and was

part of a conspiracy to defraud the United States and the holders under said New Madrid locations, and that in further- ance of said conspiracy said Beebe entered into a so-called bond to convey to the original holders and claimants of said lands the title which he was to and did acquire by the issue of said patents on said float claims, which he afterwards fraudu- lently failed and refused to do, all of which was a fraud on the United States, and other claimants to, and settlers upon, said lands; that all defects of the said New Madrid act and of the locations thereunder had been cured by subsequent acts of Congress and the opinions of the Attorney General, and de- cisions of the Department, and by decisions of the Supreme Court of the United States construing the same, and that said locations of said floats and the issuance of said Beebe patents were allowed under a misconception of the law, procured by undue means and in violation of the law, and the same were null and void, and ought in equity and good conscience to be cancelled.

The defences relied on in the court below, by way of demurrers and pleas, were (1) the want of authority in the Attorney General to file a bill for the annulment of a patent in a case like the present; (2) that the claim is barred by the statute of limitations; (3) that the claim sued upon is stale; (4) that the plaintiff has no equity to maintain this suit; and that all this appears upon the face of the bill itself. The demurrer to the bill was sustained and the bill dismissed, from which decree of dismissal an appeal on behalf of the United States brought the case here.

*Mr. Henry M. Baker* for appellant.

*Mr. U. M. Rose* for appellee. *Mr. S. A. Williams* was with him on the brief.

MR. JUSTICE LAMAR, after stating the case as above reported, delivered the opinion of the court.

The points involved in the pleadings and made before the court below have been presented and urged with much earn- estness, both in the brief and in the oral argument of counsel.

First. As to the right of the Attorney General to bring this suit.

The authority of the Attorney General under the Constitution and laws of the United States to institute a suit in the name of the United States to set aside a patent alleged to have been obtained by fraud or other mistake, whenever denied by a specific pleading before this court, has been uniformly maintained. And it may now be accepted as settled that the United States can properly proceed by bill in equity to have a judicial decree of nullity and an order of cancellation of a patent issued in mistake, or obtained by fraud, where the Government has a direct interest, or is under an obligation respecting the relief invoked. (See the opinion of the court delivered by Mr. Justice Miller in *San Jacinto Tin Company* v. *The United States,* 125 U. S. 273, decided this term of the court.)

Even if it had not been thus authoritatively settled, it would have been difficult, upon principle, to reach any other conclusion. The public domain is held by the Government as part of its trust. The Government is charged with the duty and clothed with the power to protect it from trespass and unlawful appropriation, and under certain circumstances, to invest the individual citizen with the sole possession of the title which had till then been common to all the people as the beneficiaries of the trust. If a patent is wrongfully issued to one individual which should have been issued to another, or if two patents for the same land have been issued to two different individuals, it may properly be left to the individuals to settle, by personal litigation, the question of right in which they alone are interested. But if it should come to the knowledge of the Government that a patent has been fraudulently obtained, and that such fraudulent patent, if allowed to stand, would work prejudice to the interests or rights of the United States, or would prevent the Government from fulfilling an obligation incurred by it, either to the public or to an individual, which personal litigation could not remedy, there would be an occasion which would make it the duty of the Government to institute judicial proceedings to vacate such patent.

In the case before us the bill avers that the patents whose cancellation is asked for were obtained by fraud and imposition on the part of the patentee, Beebe. It asserts that there exists, on the part of the United States, an obligation to issue patents to the rightful owners of the lands described in the bill ; that they cannot perform this obligation until these fraudulent patents are annulled, and that they therefore bring this suit to annul these fraudulent instruments whose existence renders the United States incapable of fulfilling their said prior obligation.

The court below held that the bill in this case having been filed on the recommendation of the Secretary of the Interior, for the declared purpose of having the questions which were being pressed upon the Land Department, in connection with the claims of the Philbrook heirs against the Government, determined by the judicial department, which claims were unsettled and important, the appeal to the court was proper. In this we think the learned judge is in full accord with the principle laid down by Mr. Justice Miller in the *San Jacinto* case, and within the following language of the court in *Hughes* v. *The United States*, 4 Wall. 232, 236, which was a suit brought in the name of the United States to set aside a patent for the benefit of a private citizen entitled to the land covered by said patent. Mr. Justice Field, who delivered the opinion of the court, speaking of the patent to Hughes, said : " Whether regarded in that aspect or as a void instrument, issued without authority, it *primâ facie* passed the title, and therefore it was the plain duty of the United States to seek to vacate and annul the instrument to the end that their previous engagement be fulfilled by the transfer of a clear title, the one intended for the purchaser by the act of Congress." Unless, therefore, it appears on the face of the bill that the claim set up has no equity, or that there are valid defences to the suit, the jurisdiction of the court to entertain it cannot be denied.

Next, as to the defence of the statute of limitations, laches, and lapse of time. The grounds on which the court below sustained the demurrer were, (1) that distinct from and inde-

pendent of the statute of limitations and the laches of the public officers of the Government, the lapse of time constitutes a good defence to this suit, upon those principles of equity which would be administered as between two citizens litigating in this tribunal; and (2) that the United States is bound by the same law.

The counsel for the complainant maintain that this conclusion, upon which the decree of dismissal rests, is erroneous and contrary to the decisions of this court and of every Circuit and District Court in the United States.

The principle that the United States are not bound by any statute of limitations, nor barred by any laches of their officers, however gross, in a suit brought by them as a sovereign Government to enforce a public right, or to assert a public interest, is established past all controversy or doubt. *United States* v. *Nashville &c. Railway Company*, 118 U. S. 120, 125, and cases there cited. But this case stands upon a different footing, and presents a different question. The question is, Are these defences available to the defendant in a case where the Government, although a nominal complainant party, has no real interest in the litigation, but has allowed its name to be used therein for the sole benefit of a private person?

It has been not unusual for this court, for the purposes of justice, to determine the real parties to a suit by reference, not merely to the names in which it is brought, but to the facts of the case as they appear on the record. Thus, in the case decided at this term, *In re Ayers*, 123 U. S. 443, 492, 493, the court held that the State of Virginia, though not named as a party defendant, was the actual party in the controversy. Mr. Justice Matthews, who delivered the opinion, said: " It is, therefore, not conclusive of the principal question in this case, that the State of Virginia is not named as a party defendant. Whether it is the actual party . . . must be determined by a consideration of the nature of the case as presented on the whole record." So in the cases of *New Hampshire* v. *Louisiana* and *New York* v. *Louisiana*, 108 U. S. 76, 80, the court looked behind and through the nominal parties on the record to ascertain who were the real parties to the suit. Chief

Justice Waite, in delivering the opinion of the court, used the following language: "No one can look at the pleadings and testimony in these cases without being satisfied, beyond all doubt, that they were in legal effect commenced, and are now prosecuted, solely by the owners of the bonds and coupons. . . . The bill, although signed by the Attorney General, is also signed, and was evidently drawn, by the same counsel who prosecuted the suits for the bondholders in Louisiana, and it is manifested in many ways that both the State and the Attorney General are *only nominal actors in the proceeding.* The bond-owner, whoever he may be, was the promoter and is the manager of the suit. . . . And while the suits are in the names of the States, they are under the actual control of individual citizens, and are prosecuted and carried on altogether by and for them."

In the case of *The United States* v. *Nashville &c. Railway Company, supra,* in which it was decided that the statute of limitations of the State of Tennessee was no defence to an action of the United States upon certain negotiable bonds held by them for public use, Mr. Justice Gray is careful to say, "This case does not present the question, what effect the statute of limitations may have in an action on a contract in which the United States have nothing but the *formal* title, and the whole *interest* belongs to others;" and cites *Maryland* v. *Baldwin,* 112 U. S. 490; *Miller* v. *State,* 38 Alabama, 600.

In the former case it was held that a suit in the name of a State for the benefit of parties interested is to be regarded as a suit in the name of the party for whose benefit it is brought. Mr. Justice Field, delivering the opinion of the court, said: "The name of the State is used from necessity when a suit on the bond is prosecuted for the benefit of a person interested, and, in such cases, the real controversy is between him and the obligors on the bond;" and the case was decided upon a consideration of the merits as if the party interested was alone named as plaintiff. And he cited, approvingly, the following language in *McNutt* v. *Bland,* 2 How. 9: "As the instrument of the state law his (the Governor's) name is in the bond and to the suit upon it, but in no just view . . . can he be con-

sidered as a litigant party. Both look to things, not names — to the actors in controversies and suits, not to the mere forms or inactive instruments used in conducting them in virtue of some positive law."

In *Miller* v. *The State*, the other case cited by Mr. Justice Gray, the court said : "As *laches* is not to be imputed to the Government, the statute of limitations does not apply to the State, unless it be clear from the act that it was intended to include the State. . . . In our opinion, the rule that the statute of limitations does not run against the State, has no application to a case like the present, when the State, though a nominal party on the record, has no real interest in the litigation, but its name is used as a means of enforcing the rights of a third party who alone will enjoy the benefits of a recovery."

In *Moody* v. *Fleming*, 4 Georgia, 115, 118, which was a case where a party was applying for a mandamus in the name of the State, the court said : "It is insisted, that here the State is a party, moving the contest, and setting up a right to have this survey certified, and that the tenant will not be protected by his possession, because the statute of limitations does not run against the State. We have decided, and the decision is sustained by unbroken masses of authority, that the statute of limitations does not run against the State. The answer, however, to this argument is this : The State of Georgia is not the *real party* to the proceeding. . . . The process is *in the name* of the State, but the right asserted is a private right; the issue is between two of the citizens of the State."

Applying these principles to this case, an inspection of the record shows that the Government, though in name the complainant, is not the real contestant party to the title or property in the land in controversy. It has no interest in the suit, and has nothing to gain from the relief prayed for, and nothing to lose if the relief is denied. The bill itself was filed in the name of the United States, and signed by the Attorney General on the petition of private individuals, and the right asserted is a private right, which might have been asserted without the intervention of the United States at all.

In his letter to the United States District Attorney upon the subject the Attorney General directs that that officer shall sign his (the Attorney General's) name to the bill, when the attorneys for the petitioners shall present such a bill, and file the same in the proper court, and that after the suit is commenced these attorneys for the petitioners will have the management of the case. Accordingly the subsequent proceedings in the case have been conducted exclusively by these attorneys, who, in the pleadings, describe themselves as attorneys for the petitioners and beneficiaries of the suit.

We are of the opinion that when the Government is a mere formal complainant in a suit, not for the purpose of asserting any public right or protecting any public interest, title, or property, but merely to form a conduit through which one private person can conduct litigation against another private person, a court of equity will not be restrained from administering the equities existing between the real parties by any exemption of the Government designed for the protection of the rights of the United States alone. The mere use of its name in a suit for the benefit of a private suitor cannot extend its immunity as a sovereign government to said private suitor, whereby he can avoid and escape the scrutiny of a court of equity into the matters pleaded against him by the other party; nor stop the court from examining into and deciding the case according to the principles governing courts of equity in like cases between private litigants.

These principles, so far as they relate to general statutes of limitation, the laches of a party, and the lapse of time, have been rendered familiar to the legal mind by the oft-repeated enunciation and enforcement of them in the decisions of this court. According to these decisions, courts of equity in general recognize and give effect to the statute of limitations as a defence to an equitable right, when at law it would have been properly pleaded as a bar to a legal right. They refuse to interfere to give relief when there has been gross negligence in prosecuting a claim, or where the lapse of time has been so long as to afford a clear presumption that the witnesses to the original transaction are dead, and the other means of proof have disappeared.

We think the court below justly and wisely applied the principle to the' case under consideration in sustaining the demurrer and dismissing the bill. The rights of the Philbrook heirs, the real parties to this case, which are set up in this bill, originated in 1815. The acts of Beebe perpetrating the alleged fraud were prior to 1838. The alleged illegal action of the Land Department occurred in 1839. More than forty-five years ago, the complainants in this bill could have instituted their action. The death of the parties charged with the fraud, and also of most, if not all, of the witnesses having personal knowledge of the transaction, the fact that a city has been built upon the land in question, the occupation of large portions of it by hundreds of innocent purchasers, the homesteads of many families covering other portions of it, the uninterrupted possession maintained for more than a generation, all resting upon faith in the patent issued by the United States Government, constitute reasons more than sufficient for the refusal of the court to set aside such patent at the suit of a party who has so long slept upon his alleged rights. For the reasons herein stated, the decree of the court below is

*Affirmed.*