# UNITED STATES ET AL. *v.* NEW ORLEANS PACIFIC RAILWAY COMPANY ET AL.

# UNITED STATES ET AL. *v.* NEW ORLEANS PACIFIC RAILWAY COMPANY ET AL.

# UNITED STATES ET AL. *v.* NEW ORLEANS PACIFIC RAILWAY COMPANY ET AL.

APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

Nos. 164, 165, 166.  Argued December 10, 11, 1918.—Decided January 27, 1919.

Persons qualified and claiming under the Homestead Law who, before the definite location of the New Orleans Pacific Railway between Whitecastle and Shreveport (November 17, 1882), settled on portions of odd-numbered sections within the primary and indemnity limits of its grant, erecting dwellings and in part cultivating and fencing their respective tracts, and who thereafter maintained their claims, residency, occupation and cultivation, *held* entitled to the benefits of the Act of February 8, 1887, c. 120, 24 Stat. 391, which, while confirming the grant to the Railway Company, provides that lands occupied by actual settlers at the date of said definite location and still remaining in the possession of them or of their heirs, or assigns, shall be excepted from the grant and be subject to entry under the public land laws.  Pp. 516–519.

The provisions of the Act of 1887, *supra,* §§ 2 and 6, in favor of settlers, became applicable, when accepted by the confirmee company, to all of the unpatented lands and to such of the patented lands as it had not sold (p. 515), and to indemnity as well as to place lands (p. 521); but not to lands which while vacant and unclaimed, were withdrawn from entry and sale, and were patented to the Railway and by it conveyed to a *bona fide* purchaser, before the act was passed.  P. 520.

Subsequent purchasers from the Railway were charged with notice of the Act of 1887, *supra,* and of the claims of settlers, entitled to its benefits, and occupying the tracts purchased.  *Id.*

Because of the obligations which the act imposes, the United States

may maintain a suit on behalf of settlers to secure their rights under
the act against the Railway and its grantees holding the legal title
through patents.  P. 518.

In such a suit, affecting a patent issued to the Railway before the Act
of March 2, 1896, c. 39, 29 Stat. 42, the five year limitation of that
act may be a bar to relief by cancellation, but the bill may stand upon
the more appropriate prayer, to affix a trust upon the legal title in
favor of the settlers. *Id.*

While the laches of a private person is imputable to the United States
in a suit brought by it for his benefit, in this case it is *held*, that
settlers, entitled to the benefits of the Act of 1887, *supra*, who main-
tained peaceable and continued possession, affording notice of their
equitable rights which they asserted and sustained before the Land
Department, and who relied upon the promise of that Depart-
ment to secure their titles and on suits brought by the Government
to that end, were not guilty of laches, notwithstanding long delays
in the litigation. *Id.*

235 Fed. Rep. 846, reversed.

235 Fed. Rep. 841, affirmed in part and reversed in part.

THE cases are stated in the opinion.

*Mr. Assistant Attorney General Kearful* for the United
States:

The United States has the capacity to maintain these
suits because of its obligation to the interveners and its
duty to the public.

The effect of the Act of February 8, 1887, was to re-
serve from the grant and except from the railroad patents
the lands in question for the benefit of the interveners.

The suits are not barred by limitation, because: (*a*)
The suits are to establish title by enforcing an exception
rather than to vacate or annul patents.  (*b*) The lands are
not claimed by the Government in its own sole interest
as public lands, and it is only to such lands that the limi-
tation applies.

The suits are not barred by laches, because: (*a*) The
intervening claimants have always been and are still in
the hands of the Government, against whom laches is

not chargeable.   (*b*) The claimants having the right to rely upon their possession and the decision of the Land Department, it is not they but the defendants who are guilty of laches.

The defendant lumber companies are not *bona fide* purchasers.

*Mr. Mark Norris, Mr. F. G. Hudson* and *Mr. H. H. White*, with whom *Mr. J. G. Palmer* was on the briefs, for appellees:

The patents were regularly and rightly issued because § 2 of the Act of February 8, 1887, applies neither to lands which were patented previous to the passage of that act ("patented lands"), nor to ("indemnity") lands, selected. in lieu of a failure of the lands granted within the primary limits of the grant ("place" lands).

Neither §§ 2, 4, or 6, nor any other part of the Act of 1887, granted to the interveners any special or preferential rights in the lands.

This litigation involves neither an interest of the Government, an obligation to the public nor a duty to these interveners, and therefore is altogether a conflict of private rights, which both the United States and the interveners are without capacity to maintain herein.

The alleged rights of the Government and of the interveners are barred by the prescription, limitation and confirmation, pleaded both in bar of the action and, affirmatively, as a muniment of title.

The bill is without equity.   Both the Government, admittedly a nominal party, and the interveners, the settler-claimants, are, alike, estopped to question the patents, 29 years after their issuance.

The appellees are *bona fide* purchasers, for value and without notice, both in the meaning of the general rule and the confirmatory statutes pleaded.

The issuance of the patents was an adjudication that

no one was in possession; that they were public lands in every sense of the term.

The relative rights of a grantee company and an individual occupant or entryman must be determined by record evidence under the New Orleans Pacific Grant the same as under other railroad grants.

The lands were rightly patented under the general location of November 11, 1871, as required by the Act of March 3, 1871, as well as under the definite location of November 17, 1882.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

These suits are so related that they may be disposed of in a single opinion. Three tracts of land in Vernon Parish, Louisiana, each containing one hundred sixty acres, are in controversy—one in each suit. All are in odd-numbered sections within the limits of the grant of March 3, 1871, to the New Orleans, Baton Rouge and Vicksburg Railroad Company, c. 122, 16 Stat. 573,—one being within the primary and two within the indemnity limits. All were patented under the grant and afterwards sold by the patentee, the purchasers paying a fair price. Through successive sales the title under the patents was passed along to other purchasers. Whether the latter shall be decreed to hold the title in trust for certain homestead claimants whose claims are founded on settlements antedating the issue of the patents, and also the definite location of the road, is the matter in controversy.

The suits were brought by the United States, the defendants being the patentee and the present holders of the title under the patents. The relief prayed was that the patents be canceled, or, if that be not done, that the homestead claimants be decreed to be the equitable owners and that a trust in their favor be declared and enforced. Of

these alternative prayers, the latter was better suited to the case stated.  By leave of the court the homestead claimants intervened, set forth their claims, alleged that the patentee and all the purchasers took the title with full notice of their claims, asserted that the title was held in trust for them and sought relief accordingly.  Various defenses were set up in the answers, such as the lapse of the period prescribed for bringing suits to cancel patents, laches on the part of the homestead claimants and good faith on the part of the purchasers.  On the final hearing the District Court entered a decree for the defendants in each of the suits, and this was affirmed in the Circuit Court of Appeals.  235 Fed. Rep. 841 and 846.  The District Court did not make any specific finding of fact or assign any particular reason for its decree, and the Circuit Court of Appeals rested its decision on three grounds: (a) that in so far as the suits sought a cancellation of the patents they were barred because not brought within the time prescribed by law; (b) that, if a trust had arisen in favor of the homestead claimants, its enforcement was a matter in which the United States was without interest or concern; and (c) that, if such a trust had arisen, it had become unenforceable by reason of inexcusable laches on the part of the homestead claimants.

The grant of March 3, 1871, was made to the New Orleans, Baton Rouge and Vicksburg Railroad Company, "its successors and assigns," to aid in the construction of a railroad from New Orleans to Shreveport, and embraced all the odd-numbered sections of public land within twenty miles (the primary limits) on each side of the road, subject to enumerated exceptions, one of which excluded any land to which a preëmption or homestead claim may "have attached" at the time the line of the road was definitely located.  In lieu of the excepted lands others in odd-numbered sections within prescribed indemnity limits were to be selected.  Whenever, and as often as, twenty

consecutive miles of road were completed and put in running order patents were to be issued for the lands opposite to and coterminous with that portion of the road. The entire road was to be completed within five years. Within two years the company was to designate the "general route" of the road and to file a map of the same in the Department of the Interior. There was no provision directly calling for a map showing the definite location of the road, but that such a map was to be filed was plainly implied.

The general route of the road was designated on a map filed and accepted in November, 1871. The Secretary of the Interior, complying with an express provision in the granting act, then caused the odd-numbered sections within the primary limits to be withdrawn from entry and sale. That withdrawal became effective in December, 1871, and included the tract in controversy in No. 166. The Secretary also ordered a like withdrawal of the odd-numbered sections within the indemnity limits, but as the granting act did not authorize, but in effect prohibited, their withdrawal, this part of the order was of no effect. *Southern Pacific R. R. Co.* v. *Bell,* 183 U. S. 675.

No part of the railroad was constructed by the original grantee, and on January 5, 1881, it transferred the grant to the New Orleans Pacific Railway Company. At that time this company had a line of completed railroad extending from New Orleans to Whitecastle in the direction of Shreveport, and thereafter, during the years 1881 and 1882, it constructed, completed and put in running order, the road from Whitecastle to Shreveport. It also filed with the Secretary of the Interior, on November 17, 1882, a map showing the definite location of the part of the road opposite the tracts now in controversy, and the map was accepted. The road as completed was examined and accepted, and the company was recognized by the Secretary of the Interior, the Attorney General and the President,

as rightly entitled to patents for the lands falling within the terms of the grant and lying opposite the road from Whitecastle to Shreveport.

Thereafter, in 1885, patents for a large part of the lands were issued to the New Orleans Pacific Railway Company, the assignee of the grant. Other lands remained as yet unpatented. About that time this company's rights under the grant were persistently questioned by persons who insisted that the grant was not assignable, that all rights under it were extinguished when the road was not constructed within the five years prescribed therefor, and that in any event a forfeiture could and should be declared for the failure to comply with that condition, although the road had been completed in the meantime. Because of this the Secretary of the Interior, although not acceding to the insistence, suspended the issue of patents and called the matter to the attention of Congress, saying in that connection that the company had—

". . . purchased a portion of a line of a railroad already built from New Orleans to Whitecastle, a distance of sixty-eight miles; as to this portion of the road the company waived claim to the land granted. The residue of the road, from Whitecastle to Shreveport, was built by the company upon the belief of the full validity of their right to the land granted, and without this benefit of the grant the road would not have been built. The government railroad examiner reports the road substantially built and equipped, and it would not appear to comport with good faith to those who invested their money on the basis of the grant to take advantage of any technical defect, if such exists, in the transfer to the company. I would, therefore, respectfully suggest for the consideration of Congress the propriety of passing an act curative of defect, if any exists, in the transfer to the New Orleans Pacific Company, and vesting the title, originally granted to the New Orleans, Baton Rouge and Vicksburg Rail-

road Company from Whitecastle to Shreveport, in the New Orleans Pacific Road."

With the matter thus brought to its attention Congress passed the Act of February 8, 1887,[1] c. 120, 24 Stat. 391. By its first section a part of the grant, with which we are not here concerned, was declared to be forfeited and was restored to the public domain. By its second section the part of the grant on the west side of the Mississippi River opposite to and coterminous with the road from White-castle to Shreveport, which was constructed by the New Orleans Pacific Railway Company as assignee of the grant, was confirmed to that company save as it was declared in a proviso "that all said lands occupied by actual settlers at the date of the definite location of said road and still remaining in their possession or in possession of their heirs or assigns shall be held and deemed excepted from said grant and shall be subject to entry under the public land laws of the United States." By this section the map of November 17, 1882, was required to be treated as the "definite location" of the part of the road opposite the lands now in controversy. By the third section the confirmation in the second was conditioned on the acceptance by the company of the provisions of the act. The fourth section is not material here. The fifth section authorized the Secretary of the Interior to make all needful rules and regulations for carrying the act into effect. The sixth section confirmed the patents already issued to the company, but with the express qualification that "the Secretary of the Interior is hereby fully authorized and in-

---

[1] The general history of the grant, together with the executive and legislative action relating to it, up to the date of this act, is set forth at length in the following: Senate Report No. 711, 47th Cong., 1st sess.; 17 Op. A. G. 370; Senate Ex. Doc. No. 31, 48th Cong., 1st sess.; House Report No. 1556, 48th Cong., 1st sess.; House Ex. Doc. No. 1, pt. 5, p. 43, 49th Cong., 1st sess.; House Report No. 2698, 49th Cong., 1st sess.; House Ex. Doc. No. 1, pt. 5, p. 49, 49th Cong., 2d sess.

structed to apply the provisions of the second, third, fourth, and fifth sections of this act to any of said lands that have been so patented, and to protect any and all settlers on said lands in all their rights under the said sections of this act."

The company duly accepted the provisions of the act and in that way assented to and became bound by every provision in it—the unfavorable as well as the favorable. The provisions of special importance here are the proviso in § 2 and the latter part of § 6. By one all lands occupied by actual settlers at the time of the definite location of the road and remaining in their possession, or that of their heirs or assigns, were "excepted from said grant" and made "subject to entry under the public land laws"; and by the other the Secretary of the Interior was authorized and instructed to apply the same rule to all lands for which patents already had been issued, and to protect all settlers on such lands in their rights under the act.

It does not admit of any doubt that these provisions, when accepted, became applicable to all the unpatented lands and to such of the patented lands as had not then been sold by the company. Whether they also became applicable to such of the patented lands as were sold theretofore is a question which will be considered presently.

Of the lands in suit, 80 acres were both patented and sold before the act was passed or accepted, 280 acres were patented before the act was passed and sold after it was accepted, and 120 acres were both patented and sold after the acceptance. Thus all but 80 acres came certainly within the reach of the two provisions as accepted. The 80 acres, as to which the question is left open for the moment, are part of the tract in controversy in No. 166.

As before stated, the part of the road opposite these lands was definitely located November 17, 1882. At that time there was an actual settler on each of the 160-

acre tracts. In each instance the settler had the qualifications named in the homestead law, was expecting to acquire the title under that law, had placed on the land a habitable dwelling in which he and his family were living, had cleared, fenced and was cultivating several acres and was asserting a claim to the entire tract. The settler in No. 164 continued his residence, occupancy and cultivation until 1896, when he died, and thereafter his widow continued the occupancy and cultivation, either · personally or through tenants.· The settler in No. 165 continued his residence, occupancy and cultivation to the time of the hearing in the District Court. And the settler in No. 166 continued his residence, occupancy and cultivation until 1885, when he sold his improvements and possessory right to another, who had the requisite qualifications and wished to acquire the title under the homestead law. The assignee then settled on the tract and thereafter resided thereon with his family and continued the occupancy and cultivation begun by his assignor. While in No. 164 the widow, and in No. 166 the assignee, succeeded to the rights of the original settler, we shall speak of all the claims as if the original settlers were the present claimants.

The existence and extent of these claims were well known among the people of the neighborhood, and the improvements and evidences of inhabitancy and cultivation on each tract were such that any one purchasing under the land grant would be charged with notice of the nature and extent of the settler's claim.

The settlers applied at the local land office—one in 1888, one in 1890 and the other in 1896—to make homestead entries of the lands and the railway company opposed their applications. Hearings were had and the contests ultimately were determined in favor of the settlers—one in 1893, one in 1896 and the other in 1898. The decision in each contest was to the effect that the proofs established

the right of the settler to receive the title · under the proviso in § 2 and the latter part of § 6. All the lands had then been patented, and the settlers were advised by the regulations which the Secretary of the Interior had adopted, as also by the decisions in the contests, that the Land Department would secure a relinquishment of the outstanding title for their benefit. 5 L. D. 688. In 1892, before the contests were decided, the company and the trustees of its land grant had filed the following stipulation with the Secretary of the Interior, 15 L. D. 576:

"That in cases where patents have issued to said railway company for lands which have been or may hereafter be adjudged by the Commissioner of the General Land Office to have been in the possession of actual settlers at date of the definite location of said railway company's road, and title is in said railway company, said railway company and said trustees agree to make without delay conveyance thereof to the United States; and where such lands have been sold by said railway company to third persons, said railway company undertakes to recover title thereto without delay, and convey the same to said settlers or to the United States, and the said trustees undertake to join in such conveyances and to do all acts necessary on their part to enable the railway company to carry out this agreement and stipulation."

After the contests were decided the Land Department called on the company to reconvey or surrender the title, but this was not done; and the Secretary of the Interior requested the Attorney General to institute judicial proceedings to secure for the settlers the protection promised in the Act of 1887, which the company had accepted. Acting on this request the Attorney General, on February 27, 1901, brought a suit in the name of the United States against the railway company and others to cancel and annul the patents to these and many other lands similarly situated. Various obstacles were encountered in

the prosecution of that general suit, one being that the
purchasers from the company were not made parties, and
on January 21, 1915, while that suit was still pending, the
Attorney General brought the suits with which we are now
concerned.

As the patents were issued before, and the suits were
brought more than five years after, the Act of March 2,
1896, c. 39, 29 Stat. 42, the prayer that the patents be
canceled must be put out of view, and the alternative
prayer—that the title under the patents be declared to be
held in trust for the homestead claimants and the trust
enforced—must be regarded as if standing alone.

The right of the United States to maintain the suits is
questioned on the ground that the enforcement of the
asserted trust is a matter in which the United States is
without interest or concern. Were the premise tenable,
the conclusion would follow as of course. But the premise
is not tenable. A pecuniary interest in the relief sought is
not essential; it is enough if there be an interest or con-
cern arising out of an obligation to those for whose benefit
the suits are brought. *United States* v. *San Jacinto Tin
Co.*, 125 U. S. 273, 285–286; *United States* v. *Beebe*, 127
U. S. 338; *United States* v. *American Bell Telephone Co.*,
128 U. S. 315, 367; *Heckman* v. *United States*, 224 U. S.
413, 439. By the Act of 1887 the United States undertook
to invest settlers coming within the provisions of that
act with the title to the lands in their possession, and also
"to protect" them in that right. This meant that they
were to receive a clear title. The act charged the Secretary
of the Interior with the duty of adopting appropriate
measures to that end, and when other means failed he
invoked the aid of the Attorney General, who brought
these suits. Through them the United States seeks to
fulfill its obligation under the act to the settlers, and in this
it has the requisite interest or concern.

When the United States sues to enforce a public right

or to protect a public interest the defense of laches is not available; but when the suit, although in the name of the United States, is brought for the benefit of a private person his laches may be interposed with like effect as if he were suing. *United States* v. *Beebe, supra.* Applying this view, the court below reached the conclusion that the settlers had been guilty of such laches as would bar them from the relief sought. We are unable to concur in that conclusion. The occupancy of the settlers was both peaceable and continuous and gave notice of their equitable rights. Their claims were asserted before the Land Department, were the subjects of hearings and appeals, and were by it sustained. The land officers, conformably to the published regulations, undertook to secure a restoration of the outstanding title, and to that end the suit of 1901 was brought. The settlers were justified in believing that their rights were being protected, as was required by the Act of 1887. No attempt was made to disturb their occupancy or to assert any right against them. We therefore think it properly cannot be said that they were guilty of any such laches as precluded them from obtaining relief in equity. As a general rule, one who is in peaceable possession under an equitable claim does not subject himself to a charge of laches for mere delay in resorting to equity to establish his claim against the holder of the legal title where the latter manifests no purpose to disturb him or to question his claim. *Ruckman* v. *Cory,* 129 U. S. 387, 389–390. We think that rule is applicable here.

On the merits, we are of opinion that the Act of 1887, as accepted by the company, operated to exclude from the grant and to subject to these settlement claims all the lands in controversy, patented and unpatented, save the 80 acres which are yet to be specially noticed. In so far as these lands were patented it became the duty of the railway company to surrender the title, and in so far as

they were unpatented the act forbade the issue of patents
to the company for them. Intending purchasers were
bound to take notice of the occupancy of the settlers,
and this, with the Act of 1887, which was a public law,
renders untenable the claim that those who hold the title
under the patents have the status of *bona fide* purchasers.
In these circumstances the settlers, whose claims come
within the proviso in § 2 and the latter part of § 6, are
entitled to have a trust in their favor declared and en-
forced.

The situation as to the 80 acres which were both pat-
ented and sold before the Act of 1887 was passed is not
the same. Under an express provision of the Act of 1871,
they were withdrawn from entry and sale while they were
yet vacant and unclaimed, and the withdrawal was still
in force in 1885, when they were patented. No valid
claim to them could be initiated by settlement or other-
wise in the presence of the withdrawal. *Hamblin* v. *West-
ern Land Co.*, 147 U. S. 531, 536; *Wood* v. *Beach*, 156 U. S.
548; *Spencer* v. *McDougal*, 159 U. S. 62. They were part
of an odd-numbered section within the primary limits and
opposite a twenty-mile section of the road which was
constructed, completed, put in running order and ac-
cepted by the President before they were patented. In
other words, they were lawfully patented and when the
company sold them, in 1886, it had the right to do so.
The purpose of the granting act in directing that patents
be issued as each section of twenty miles of road was
completed was to enable the company to sell the lands and
realize on the grant. In these circumstances the purchase
was *bona fide* and the purchaser took the full title. It
follows that before the Act of 1887 was passed the 80
acres—described as the S. ½ of N. W. ¼ of Sec. 3, T. 3 N.,
R. 7 W., L. M.—had passed into hands where they were
not within the reach of the act or the company's ac-
ceptance. The fact that this land was sold before the

act was passed seems not to have been brought to the attention of the Land Department—probably because the purchaser was not a party to the contest proceedings.

The contention is made that the portions of that act which are material here do not embrace lands within the indemnity limits, but only those within the primary limits. A survey of the entire act shows that the contention is without merit.

> *No. 164.    Decree reversed.*
> *No. 165.    Decree reversed.*
> *No. 166.    Decree affirmed as to S. ½ of N. W. ¼ of Sec. 3, T. 3 N., R. 7 W., L. M., and reversed as to the other lands.*