## In re CUBAN–ATLANTIC TRANSPORT CORPORATION.

### No. 315.

Circuit Court of Appeals, Second Circuit. April 11, 1932.

See, also, 22 F.(2d) 321.

George Z. Medalie, U. S. Atty., of New York City (William E. Collins and Arthur H. Longfellow, Sp. Assts. to U. S. Atty., both of New York City, of counsel), for the United States.

Zalkin & Cohen, of New York City (Israel Akselrod, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The Cuban-Atlantic Transport Corporation was adjudicated bankrupt in October, 1920. This claim of the United States was not presented until more than ten years later. Nevertheless, it must be considered upon its merits for the limitation imposed by section 57n of the Bankruptcy Act (11 USCA § 93n) does not apply to the United States. United States v. Birmingham Tr. & Savings Co., 258 F. 562 (C. C. A. 5); In re Menist Co., Inc., 294 F. 532, 533 (C. C. A. 2); In re Stoever, 127 F. 394 (E. D. D. C. Pa.). Nor is the sovereign barred by laches in delaying to enforce its rights. Gibson v. Chouteau, 13 Wall. 92, 99, 20 L. Ed. 534; United States v. Beebe, 127 U. S. 338, 344, 8 S. Ct. 1083, 32 L. Ed. 121; United States v. Alex Dussel Iron Works, 31 F.(2d) 535, 537 (C. C. A. 5).

The amended claim presents three distinct items, one for the balance of the purchase price of the tug Bartolome, another for consumable stores delivered with said tug, and a third for fuel oil delivered to the tug Bascobel while under charter to the bankrupt. These will be considered seriatim.

As to the first item, which is the main part of the claim, the theory of the appellant is that Cuban-Atlantic Transport Corporation (the bankrupt) entered into a contract with the United States, acting through the Shipping Board, by which the bankrupt agreed to purchase the tug Bartolome for a price of

$225,000, of which 25 per cent. was to be paid in cash, and the balance to be evidenced by four interest-bearing notes of the bankrupt maturing at six months intervals and secured by a mortgage upon the tug; that agents of the Shipping Board, without authority, allowed another corporation with a similar name and the same offices as the bankrupt, namely, Cuban-Atlantic Transportation Company, to be substituted for the bankrupt when the formal documents came to be executed; and that the Shipping Board's conveyance of record title to the transportation company and acceptance of the latter's notes and mortgage did not extinguish the bankrupt's contract obligation to pay for the tug but merely furnished additional security therefor. This theory was not substantiated by the proof.

It may well be doubted whether the bankrupt ever made a binding contract to purchase the tug Bartolome. Its letter of March 2, 1920, was an alternative offer to pay for the tug $215,000 cash or $225,000 on the deferred payment plan, "25% cash and the balance in two years as per your requirements." The Shipping Board's telegram of April 3, 1920, notified the bankrupt that its offer to purchase the tug was accepted by the Board on the "deferred payment plan." If both parties had previously determined what the deferred payment plan "requirements" were, this perhaps made a contract, even though execution of a formal agreement of purchase was in contemplation. But it is not shown that there were fixed "requirements," and unless there were, terms of the purchase still remained to be agreed upon, for the offer said nothing of interest, or mortgage security, or many of the details which were embodied in the formal agreement executed under date of April 17, 1920, between the Shipping Board and the transportation company.

■ Nevertheless, we will assume arguendo that the offer and telegram did constitute a binding contract. If so, the proof shows that this contract was rescinded. As already stated, the Shipping Board entered into a formal contract with the transportation company in which it is called the "buyer," and pursuant to that contract, the bill of sale for the tug ran to the transportation company, and its notes and mortgage were accepted for the deferred payments. Of the cash payment, it supplied $51,250, while $5,000 was obtained by the application of a forfeited deposit in that amount which the bankrupt had previously deposited with the Shipping Board in connection with an attempt to purchase a

different vessel. No one reading these documents could suppose for a moment that the obligations undertaken by the transportation company were intended as additional security for performance of the bankrupt's contract to buy the Bartolome. On the contrary, it is perfectly clear that a new buyer had been substituted. And if the reorganization agreement, which the court excluded over the appellant's objection, be looked to, it becomes all the more apparent that such must have been the intention of the bankrupt and of the transportation company, for that agreement provided for the dissolution of the bankrupt, which would be impossible if it had outstanding obligations. However, what the parties thought is unimportant, for the transaction must be judged by their expressed intentions. The only scrap of evidence which might indicate that the bankrupt's contract had not been abandoned is the fact that the bankrupt signed the delivery receipt for the tug. But delivery is equivocal; it is not necessarily to the owner, and the bankrupt may have taken custody as agent for the buyer. Indeed, the record contains a concession that delivery was under the bill of sale and the tug was operated solely by the transportation company. The other documents are not equivocal and establish beyond question that the appellant made its sale to the transportation company in complete disregard of its earlier contract with the bankrupt.

■ It is urged that the Shipping Board officials had no authority to substitute another corporation for the bankrupt and thereby release the latter from its contract obligations without a vote by the board of directors. But however unauthorized the transaction may have been originally, the evidence of ratification is overwhelming. In May, 1922, a decree foreclosing the mortgage was entered in a suit brought by the United States pursuant to a resolution of the Shipping Board which recited that the transportation company entered into an agreement "to purchase" the Bartolome. Moreover, for ten years the appellant has retained the purchaser's cash payment as well as the proceeds of the foreclosure sale. Under such circumstances the original authority is unimportant.

Errors are asserted in respect to the exclusion of testimony and exhibits, but none of the excluded evidence, even if admitted, could affect the result under the views above expressed. It is unnecessary, therefore, to consider these alleged errors further.

The second item, relating to the stores on board when the Bartolome was delivered, nec-

essarily follows the disposition of the main claim. These stores were never sold to the bankrupt.

But the item for fuel oil supplied to the tug Bascobel is on a different footing. Under its charter the bankrupt agreed to "pay for all fuel." On February 12, 1920, an oil company delivered some 1,500 barrels to the tug and charged the same to the Fleet Corporation at a price of $1,832.23. This bill the United States paid in December 1920. Mr. Kirsch testified that the oil was furnished at the request of the bankrupt. While it is evident that he had no knowledge other than what his records disclosed and they showed nothing as to any request by the charterer, we think that proof of delivery to the tug was sufficient in view of the charter obligation to pay for all fuel. The fact that the Fleet Corporation's records recite that the charge is to be billed to the transportation company we do not regard as significant. Prior to the date of this notation the transportation corporation had been adjudged bankrupt, and no doubt the creditor hoped to get payment from a corporation supposed to have succeeded to the bankrupt's obligations. But whatever the explanation, there was no basis for holding the transportation company liable and no attempt to do so was proved. The obligation was that of the bankrupt; it arose prior to bankruptcy upon delivery of the oil to the tug; and nothing was done which amounted to a release of it. The claim should be allowed in the amount of $1,832.23, but without interest, as it does not appear to have been due prior to the filing of the petition in bankruptcy.

The order is reversed, without costs, and the cause is remanded, with directions to allow the claim to the extent indicated.