**UNITED STATES v. ROSE et ux.**

District Court, W. D. North Carolina, Asheville Division.

Aug. 21, 1937.

Angus D. MacLean, Sp. Asst. to the Atty. Gen., and Marcus Erwin, U. S. Atty., of Asheville, N. C.

C. C. Buchanan, of Sylva, N.C., for the defendants.

WEBB, District Judge.

This cause comes on to be heard by me upon the following agreed statement of facts:

1. The tract of land described in section 1 of the complaint was conveyed by deed, known as the Sibbald deed, dated August 14, 1880, from William Johnston and others to the Commissioner of Indian Affairs of the United States, as trustee for the Eastern Band of Cherokee Indians, it being the eighth tract as described in that deed, which was duly recorded in the office of the register of deeds of Cherokee county November 1, 1880, in Book R, pages 28–62, having been previously recorded in Buncombe, Swain, Jackson and Graham counties, N. C. The same land is included in the deed from the Eastern Band of Cherokee Indians to the United States, dated July 21, 1925, also duly recorded in said register's office in Book 34, page 349 et seq. Copies of both deeds and of any of the documents therein referred to may be exhibited and used at the trial. These deeds and other muniments of title, in connection with acts of Congress dealing with the property and affairs of the Eastern Band of Cherokee Indians, vested in the United States the older and superior paper title to the land described in the complaint, which admittedly covers and includes the locus in quo.

2. Defendants and those under whom they claim hold under the James Dockery grant, dated March 1, 1889, and under deed from James Dockery and wife to A. M. Ashe, dated April 1, 1893, the same land having been conveyed by Frank Ashe and others to Wayne Rose. Said grant and

deeds are also duly recorded in Cherokee county, and copies of the same may be exhibited and used at the hearing. Part of the land described therein is cleared and under cultivation, and for 20 years or more defendants and their predecessors in title have been in the actual possession thereof under known and visible metes and bounds and under colorable title; that is to say, under the grant and deeds referred to above, which also cover and include the locus in quo. The fair rental value of said land is $35 a year.

3. As against any private owner or claimant, it is admitted that the actual and continuous possession of the locus in quo by defendants and those under whom they claim under color of title and under known and visible metes and bounds for 20 years or more has been such as would constitute adverse possession and would bar the older or superior paper title of such private holder or claimant, but it is denied by the plaintiff that this rule applies to the locus in quo or to the Eastern Band of Cherokee Indians or to the United States of America; and, if the court should be of opinion that the rule of adverse possession does not apply, a verdict is to be directed and judgment entered for the plaintiff. If, on the other hand, the court should be of opinion that the rule does apply and that the superior paper title is divested by actual adverse possession, as above stated, a verdict is to be directed and judgment entered for defendants. In connection with their claim of title and possession, it is further admitted that defendants and those under whom they claim have for the past 20 years or more listed the tract claimed by them for taxation with the local authorities in Cherokee county and paid taxes thereon from year to year, and that they have made such actual use of the land as it was susceptible of during that period. There has been no such actual possession by the United States, but it has exercised general supervision through its agents of all the lands described in the Sibbald deed, without, however, disturbing the actual occupancy and use by defendants of the tract described in deeds to them.

The question of law for me to decide is whether or not 48 years of adverse possession, open and notorious and under colorable title, by the defendants and those under whom they claim, will bar the right of the plaintiff to recover the tract of land in question. This colorable title was a grant from the state.

The Sibbald deed, of August 14, 1880, conveying many thousand acres of land, included the tract of land in question, but no one except the defendants, and those under whom they claim, has ever had actual possession of the tract of land in question.

On March 1, 1889, about 9 years after the Sibbald deed was executed, a grant from the state of North Carolina was issued to one James Dockery for the land in litigation, and the defendants, and those under whom they claim, have had possession of this tract since that date—a period of 48 years of unbroken possession under colorable title, to wit, a grant from the state of North Carolina.

The laws of North Carolina (C.S.N.C. §§ 428, 430) provide that 7 years' possession under colorable title bars all other persons or claimants, and a 20 years' mere possession under known and visible lines and boundaries bars every person, and that 30 years is a still further bar.

Statutes of limitation are a part of the public policy of practically all governments. I cannot express this public policy better than by quoting the Supreme Court of the United States in the case of Wood v. Carpenter, 101 U.S. 135, 139, 25 L.Ed. 807. The court said: "Statutes of limitation are vital to the welfare of society and are favored in law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar. The bane and the antidote go together."

Now it is admitted by plaintiff's counsel, and in the agreed statement, that the possession by the defendants, and those under whom they claim, is sufficient to bar every claimant on earth, white and black, including the sovereign state of North Carolina; except that plaintiff claims that the bar does not apply to these Indian lands, because the land is claimed by a band of Indians. I cannot yield to the force of this reasoning. These lands were owned

by the state of North Carolina long before the Declaration of Independence was proclaimed, long before the Constitution of the United States was adopted, and long before the Congress itself was created. The federal government never owned a foot of the lands in question. None of the lands were ever a part of the public domain. They have always been, and ought always to have been, under the sovereign control of the sovereign state of North Carolina. Being lands granted by the state, they are therefore lands that should be governed by the land laws of North Carolina. Surely the fact that some of these lands have been occupied by some individual Indians should not give these Indians a superior status over and above every white man or colored man in North Carolina, and even above the state itself.

This collection of Indians, known as the Eastern Band, claiming about 30,000 acres of land in Western North Carolina, are not a tribe or a nation, and the United States has never made a treaty with them, because they are not a "tribe" or a "nation" with whom treaties may be made. The Cherokee "nation," with whom the government did make treaties, was moved to Western lands about 1835, and the Cherokee Nation or tribe has existed as such tribe or nation in the Western country ever since that time. At the time of removal there were about 900 Indians who refused to comply with the treaty between the Cherokee Nation and the United States government, and scattered through the mountains of Alabama, Georgia, Tennessee, and Western North Carolina, and wandered through the forests of these mountains until a kindly man bought a large area of land in Western North Carolina as an asylum for these scattered Indians, and by degrees they were collected upon this large acreage, and they and their descendants have remained there ever since.

■ The Supreme Court of the United States, in the Cherokee Trust Fund Cases, 117 U.S. 288, 293, 6 S.Ct. 718, 724, 29 L. Ed. 880, said with reference to these very Indians, after they had refused to go with the tribe or nation to the Western country, that "they ceased to be part of the Cherokee nation, and henceforth they became citizens of, and were subject to the laws of the state in which they resided" (that state being North Carolina). I do not think it can be contended that this expression is obiter, because it was vital to the decision of the case.

It is true that the federal Congress in later years "took pity" on these Indians, and began to assume control over their personal affairs. This control was not assumed or ordered by any treaty made and ratified as provided by the Constitution. The Commissioner of Indian Affairs was given the naked title in 1880 to this land which covers the tract in question, and he held this naked title in trust for this Band of Indians until 1902. In 1889 the Legislature of North Carolina, at the request of the Indians, and with the undoubted knowledge and consent of the federal government, passed an act, chapter 211, Private Laws of North Carolina 1889, incorporating this Band of Indians as a body politic in the following language:

"Section 1. That the North Carolina or Eastern Cherokee Indians, resident and domiciled in the counties of Jackson, Swain, Graham and Cherokee, be and the same are hereby created and constituted a body politic and corporate under the name, style and title of 'The Eastern Band of Cherokee Indians,' with all the rights, franchises, privileges and powers incident and belonging to corporations under the laws of the State of North Carolina."

Section 2 of this act gives this "Eastern Band of Cherokee Indians," so incorporated, the power to sue and implead in law or in equity in all the courts of the land touching and concerning all the property of whatever nature held in common by them, and empowers this corporation to be sued and impleaded in all the courts of the land touching and concerning the said property held as aforesaid in the said counties.

■ This act created a distinct North Carolina corporation, on a par with all other corporations created by the laws of the state. Recognizing the validity of this corporation, as set forth in the act of the Legislature referred to, the Commissioner of Indian Affairs, as trustee, conveyed all these Indian lands, which the Commissioner held in trust, back to "The Eastern Band of Cherokee Indians," a corporation, and this deed was executed in 1902. The government by this act distinctly recognized the corporate existence of these Indians and acknowledged the validity of the act of incorporation; and, in my opinion, now, after the lapse of twenty-three years, is estopped from denying the corporate existence of the Indians, because the government has recognized it by mak-

ing to it a deed. The title of these lands, which covers the tract in question, remained solely in the corporation, that is, "The Eastern Band of Cherokee Indians," until 1925. During that year the United States government again recognized the validity of this corporation by accepting from the corporation a deed to the United States for all these Indian lands, including the tract in question. It is seen, therefore, that this North Carolina corporation, created by the state of North Carolina and accepted and administered by the Indians themselves, and recognized and dealt with by the federal government as such, had sole title to all the Indian lands, including the tract in question, for a period of twenty-three years. It is admitted that during this period of 23 years the defendants, and those under whom they claim, possessed the tract of land in question under visible lines and boundaries and under colorable title, and paid taxes on the land during this period of 23 years. Against everybody else on earth this possession of the defendants would ripen title in them, and such possession would be a bar to, every individual, and even the state of North Carolina.

I cannot, therefore, see any reason why such ripened title should not bar the corporation known as "The Eastern Band of Cherokee Indians." I cannot imagine or conceive any power in Congress, under any provision of the Constitution of the United States, to abrogate and destroy the state laws passed in its sovereign capacity, with reference to lands which have belonged to the state many, many years before the Constitution of the United States was ever heard of. I seriously doubt whether the United States by treaty, negotiated by the President and ratified by the Senate, could do any such thing; and most assuredly Congress would not have such power; neither could the Commissioner of Indian Affairs.

These Indians are citizens of the United States and are citizens of North Carolina, and are eligible to vote, and many of them to vote. The fact that the United States government shows an interest in them by furnishing them a school, and supervising their other personal acts, certainly does not justify the suspension of the laws of this state with reference to state land. The fact that the Indians have been called "'wards of the Nation" makes no difference. Congress might undertake to adopt the Waldensian colony in Burke county, but certainly such act or effort would not set aside and destroy the laws with reference to the land which the Waldensians have acquired.

Nearly all the "Indian lands" in the United States belonged to the public domain, that is, to the government of the United States, and no one contends that the owner of the lands, to wit, the government, has no power to place any restrictions on the alienation of the land or as to the taxes on same. I do not think that any case can be found where the Supreme Court has ever held that the property rights of an Indian, within one of the original thirteen states, were not subject to the land laws of such state. And so it must be remembered that in the case at bar the government of the United States has never owned an acre of the land in question, and even in 1925, when the deed was made from "The Eastern Band of Cherokee Indians," a corporation, to the government of the United States, only a naked title was granted to the government for the main purpose of dividing these lands in severalty among the Indians. But even the proposal to allot the land has been abandoned by an Act of Congress in 1934 (48 Stat. 1269, as amended [43 U.S. C.A. §§ 315 et seq., 1171]), and now only the naked title is held by the federal government by reason of the deed of 1925.

"The Eastern Band of Cherokee Indians" is the real party to this suit. In the case of United States v. New Orleans Pacific Railroad Company, 248 U.S. 507, 39 S.Ct. 175, 63 L.Ed. 388, the court said, the defense of laches is not available, when the United States sues to enforce a public right or to protect a public interest, but when suit, though in its name, is for benefit of a private person, his laches may be interposed."

And again, in the case of United States v. Beebe, 127 U.S. 338, 8 S.Ct. 1083, 1086, 32 L.Ed. 121, the Supreme Court said: "The principle that the United States are not bound by any statute of limitations, nor barred by any laches of their officers, however gross, in a suit brought by them as a sovereign government to enforce a public right, or to assert a public interest, is established past all controversy or doubt. * * * But this case stands upon a different footing, and presents a different question. The question is, are these defens-

es available to the defendant in a case where the government, although a nominal complainant party, has no real interest in the litigation, but has allowed its name to be used therein for the sole benefit of a private person?"

I am therefore of the opinion that the plaintiff is not entitled to recover the tract of land on which the defendants, and those under whom they claim, have lived in peaceable possession under color of title for more than 48 years, and it will be so ordered.